**UNITED STATES of America**

**v.**

**Jorge GALVIS–VALDERAMMA and Cesar Vergara–Jiminez, Defendants.**

**Cr. No. 92–534 (JBS).**

United States District Court, D. New Jersey.

Jan. 5, 1994.

Camden, NJ, for defendant Jorge Galvis–Valderamma.

Alexander W. Booth, Jr., Brownstein, Booth & Barry, Union City, NJ, for defendant Cesar Vergara–Jiminez.

## OPINION

SIMANDLE, District Judge:

### I. *Introduction and Procedural History*

The defendants were convicted by a jury on May 11, 1993 of conspiracy to possess and distribute heroin in violation of 21 U.S.C. § 846, and possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Defendants Jorge Galvis–Valderamma and Cesar Vergara–Jiminez moved orally for a judgment of acquittal under Rule 29(c), Fed.R.Crim.P., on the grounds that the prosecutor has violated its obligation to disclose information to the defendants that was exculpatory under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that impeaches the credibility of the principal prosecution witness and should have been disclosed under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), together with a post-arrest statement of defendant while in custody which should have been disclosed under Rule 16(a)(1)(A), Fed. R.Crim.P.

The central issue at trial, identified by the prosecution and defense counsel alike in closing arguments, was whether the defendants had knowledge that heroin was present in the vehicle, in which defendant Jose Galvis–Valderamma ("Galvis") was the driver and defendant Cesar Vergara–Jiminez ("Vergara") was the passenger, which a third person had asked defendant Vergara to retrieve as a way to earn some money.

On May 20, 1993, this court held a hearing to take testimony relevant to this post-trial motion, to explore the precise contours of the non-disclosure. This dispute had its origins while the jury was deliberating and the court was called upon to review *in camera* an untimely-disclosed DEA report prepared by Investigator Salvatore Iurato (Ex. J–8, later Ex. M–2) regarding events on the night of defendants' arrests, September 16, 1992. The Iurato report (Ex. M–2) had not been

Michael Chertoff, U.S. Atty. by Ronald Wigler, Asst. U.S. Atty., Newark, NJ, John McMahon, Federal Public Defender by Richard Coughlin, Asst. Federal Public Defender,

disclosed to defendants, even though it contained post-arrest statements of each defendant and those statements were consistent with innocence, denying knowledge that heroin was present in the automobile they were occupying when arrested. The Iurato statement also placed the heroin in question at a location "under the front seat," based upon a conversation between the arresting local police officer, Leonard Cottrell, and DEA Special Agent Brian Collier. Defendants argue this new information was contrary to Officer Cottrell's testimony at pretrial suppression hearings and at trial, namely, that Officer Cottrell found the heroin at the feet of passenger Vergara and that the heroin was itself in plain view to him (Officer Cottrell) as he stood outside the passenger window of the vehicle questioning Vergara. Iurato's report mentioned that at the September 16th interrogation, Bergen County Narcotics Task Force Investigator Carmen Espinal advised defendants of their rights and obtained the statements from them.

The second new piece of evidence was the Memorandum of Investigator Espinal to Lieutenant Robert Scanlon dated September 17, 1992, marked Exhibit M–1, which first came to light at the May 20th hearing. Espinal's Memorandum explains her activities on September 16th in rendering assistance to the Ft. Lee Police Department and interrogating the two suspects. Espinal's report also mentioned that DEA Special Agent Brian Collier and other agents of the DEA questioned Vergara and Galvis, and it memorializes a fairly detailed statement by Vergara stating the circumstances under which he says he retrieved the automobile with Galvis from Queens, New York to bring it to North Bergen, New Jersey for money, but he did not know anything was in the vehicle.

At the post-trial hearing, the court heard testimony from Investigator Iurato, Special Agent Collier and Investigator Espinal. Only Iurato had testified at trial, having been called by defendant Galvis. Special Agent Collier's testimony at the post-trial hearing disclosed that he had spoken to Officer Cottrell shortly after the arrests and questioned him carefully, and that Cottrell told him that he could not see what was in the bag he

seized from under the passenger's seat, but that he seized it when he became suspicious about it and then opened it up to discover the heroin. This is directly contrary to Officer Cottrell's testimony at trial, as discussed below.

To understand the context and significance of the new information, the background of defendants' arrests and of the seizure of the heroin by Patrolman Cottrell must be set forth at some length.

## II. Evidence Relating to Search of Vehicle and Post–Arrest Statements of Defendants

In pretrial motions, defendants moved to suppress evidence consisting of approximately one kilogram of heroin seized from a bag contained in the passenger compartment of an automobile in which Galvis was the driver and Vergara was a passenger. Vergara and Galvis also sought to suppress their post-arrest statements, including a statement by Vergara to Detective Rivera (Ex. G–11) given on the night of the arrest (September 16, 1992) at the Ft. Lee Police Department and a statement by Galvis given to DEA Special Agent Ogden and Investigator Iurato (Ex. G–2) given the next morning (September 17, 1992) at the DEA Office. The suppression motions were denied after two days of hearings in an Opinion and Order filed April 23, 1993.

### A. Search of Vehicle and Seizure of the Heroin

The factual background of Officer Cottrell's traffic stop of defendants' automobile, his questioning of defendants, and his seizure of heroin from their car in plain view as he questioned them is set forth in detail at pp. 3–10 of the Opinion filed April 23, 1993. This court's Opinion found probable cause to stop the vehicle for the traffic violations of reckless driving and improper taillight and that this was the reason for the traffic stop, crediting Officer Cottrell's testimony. Opinion at 9. I also found that during the course of routine questioning about the vehicle's ownership (prompted by the fact that neither occupant was the registered owner), while standing outside the vehicle, Officer Cottrell observed a white plastic Levi's shopping bag

"in plain view at the passenger's feet forward of the right front seat." *Id.* I found that the white Levi's bag was in plain view and that neither defendant had asserted a protectable Fourth Amendment interest in the bag's contents (which included a shirt, another bag, and two zip-lock inner bags each containing heroin), *id.* at 9–10. From the facts of the seizure described by Officer Cottrell and post-arrest denials by Vergara and Galvis regarding the Levi's bag or its contents, I found "that these defendants had no expectation of privacy in the interior of the Levi's bag, even though the bag reposed at Vergara's feet." *Id.* at 17. Accordingly, the court held that:

> [T]he defendants have not shown from the circumstances of this case that they had a reasonable expectation of privacy in the contents of the Levi's bag where it appears that neither defendant asserts [for purposes of the suppression hearing] any knowledge of the bag's origins or linkage to any of its contents. To the contrary, the defendants' post-arrest statements distance themselves from any relationship to the bag. The defendants' assertions on this subject add up, for purposes of this suppression motion, to a claim that they did a favor for a stranger to transport his car and, unbeknownst to them, his bag containing heroin. This does not give rise to any reasonable expectation of privacy in that bag. That the defendants were lawfully in the presence of this bag when it was searched and seized by Officer Cottrell is likewise insufficient to confer standing.

*Id.* at 17–18 [citation and footnote omitted].

Officer Cottrell's recitation of the events leading to the defendants' arrests and his seizure of the heroin was the key testimony at the suppression hearing and at trial. He related how he observed defendants' Buick from Ft. Lee into Ridgefield, because he observed the driver make an unsafe lane change. After following the car for 1½ miles, he pulled the Buick over by activating his flashing lights. Officer Cottrell testified that as he sat in his police vehicle behind the Buick, he saw the driver and passenger bend down, out of sight, and then reappear.

He testified he approached the driver, Mr. Galvis, to examine his license, registration and insurance papers, and that Galvis's hand was shaking so much from nervousness that he dropped the papers. From the driver's side, he first noticed the white plastic bag with lettering on it under the passenger's legs, according to his testimony.

He required Galvis to step out of the vehicle and continued questioning Galvis about the vehicle's ownership, when he allegedly observed Vergara bend over in the passenger's seat two more times out of sight, believing him to be pushing the bag under the seat.

Officer Cottrell testified that he then approached the passenger's side to inquire of Vergara about the vehicle's ownership, since Galvis told him Vergara might know the answer. Vergara appeared to be very nervous, nearly poking himself in the eye with a pen, according to Office Cottrell. (A backup police car with Officer Buda appeared on the scene, but Buda was not a witness at the suppression hearing or trial.)

While questioning Vergara, Officer Cottrell testified that he stood at the passenger's side, and that he was able to see not only the large white plastic Levi's bag on the floor under Vergara's legs, but also its contents, because the bag was open at the top and angled toward the passenger's side so he could see into it. He testified at the suppression hearing, and at trial, that he could see a white bag inside, containing a black shirt and a green bag (like a green/black garbage bag) which contained a rip in it, through which he could plainly see two clear plastic bags, each with a white powdery substance in it that he suspected was a controlled substance. He testified that nothing blocked his view—not Vergara's legs, nor the white outer bag, nor the smaller white inner bag or black shirt or the torn green/black garbage bag containing the drugs. He testified that he then had Vergara step outside the vehicle and he seized the drugs in plain view.

Although the defendants could and did argue that Officer Cottrell's version of being able to see the heroin within the multiple bags was implausible and therefore incredible, the defendants did not have the benefit

at the suppression hearing or at trial of Special Agent Collier's post-trial testimony concerning the contrary statements Officer Cottrell made about this seizure.[1] Likewise, defendants argue that Special Agent Collier's version of Cottrell's debriefing was confirmed in Investigator Iurato's report, Ex. M–2, repeating Special Agent Collier's observation that the bag in question was "under the front seat," and not in plain view by the passenger's legs.

Special Agent Collier testified that he was summoned to the Ft. Lee police station on September 16th, following the arrests of the defendants. He testified that Cottrell told him that the defendants had been trying to push the bag under the seat, but that "the bag was too large, apparently, to go under the seat fully." (Tr. 5/20/93 at 42:16.) Collier emphasized, that "from where he [Cottrell] was he could not see into the bag to see white powder, but he did see this bag that the passenger was trying to place and push under the seat." (*Id.* at 42:17–20.) In response to questioning by the court, Special Agent Collier testified that Cottrell told him that he first learned there was a suspected controlled substance in the bag when he reached into the car, seized the bag and checked it. (*Id.* at 43:10–11.) Collier believed the bag itself was "quite visible" to Cottrell (*id.* at 43:16 & 43:22), but that the heroin was not. (*Id.* at 43:25–44:1.) Collier's testimony did confirm, however, Cottrell's testimony about observing furtive gestures and nervousness. (*Id.* at 44:4–16.)

Collier's function in interviewing Cottrell was noteworthy, because Collier is in the DEA's Intelligence Group (*id.* at 44:19–25), and his mission was to determine whether the federal authorities should try to follow up with a controlled delivery or further law enforcement efforts. (*Id.* at 41:14–22.) Collier

had "listened to [Cottrell] in detail so that [he] could decide whether or not to proceed with this thing on the Federal level." (*Id.* at 46:20–22.)

Special Agent Collier indicated that he communicated this information, including the circumstances of Cottrell's decision to seize the bag,[2] to the United States Attorney's Office the next day, September 17, 1992. (*Id.* 48:2–5.) He did not speak on that date with AUSA Wigler, to whom this case was eventually assigned for trial, but he spoke with the initial AUSA who took his call, and perhaps to other Assistant U.S. Attorneys at that time. (*Id.* 55:1–5.) Collier first spoke to AUSA Wigler about this after trial in preparation for the post-trial hearing. (*Id.* 59:25–60:2). Thus, this impeachment evidence, including a contradictory version of how Cottrell described the search and seizure, was in the possession of the U.S. Attorney Office since September 17, 1992 and not disclosed to the defendants before trial, although AUSA Wigler was unaware of Special Agent Collier's version until after the trial.

## B. *Post-Arrest Statements of Defendants*

The jury heard evidence regarding the post-arrest statements of defendants Galvis and Vergara, in which each suspect denied knowledge of the contents of the bag of heroin in the car. These were the Galvis statement of 9/17/92 to DEA Special Agent Ogden and Investigator Iurato at the DEA Office in Newark (Ex. G–2), and the Vergara statement of 9/16/92 to Detective Rivera (who was on special assignment to the DEA) at the Ft. Lee Police Department (Ex. G–12 at trial.) These statements were held to be admissible for reasons given in the court's decision denying defendants' suppression mo-

---

1. Likewise, in this court's assessment of Officer Cottrell's credibility at the suppression hearing as necessary to establish a basis for the vehicle stop, questioning of the defendants, and sighting of the Levi's bag in a non-private space, this court did not have the benefit of the new impeachment information which is the subject of this Opinion. No motion has yet been presented for reconsideration of any suppression issue herein, so no opinion can be expressed herein as to suppression of evidence or statements.

2. Special Agent Collier testified that he was certain he told the Assistant United States Attorneys that Cottrell said he could not see the contraband in plain view:

> Q. Did you tell them that it was your understanding that Officer Cottrell could plainly see the bag from outside the car, but that he could not see the contents of the bag?
> A. Very definitely, yes, sir.
> Tr. 53:5–9.

tion, in the Opinion filed April 23, 1993 at 20–29.[3]

Detective Rivera testified at trial about the statement Vergara made to him on September 16th. Rivera testified from his report of Vergara's statement (Ex. G–12) to the effect that Vergara said he had been met by an unknown Colombian male earlier in the day in Union City, New Jersey, who was a person he knew from frequenting the same restaurant. The unnamed Colombian asked him to do a favor by picking up a red Buick parked in Queens, New York, and bringing it to a street near a park in New Jersey. The man furnished him with the car keys. Vergara said he asked Galvis to accompany him as a favor because Vergara did not have a valid driver's license. Vergara said he didn't know the heroin was in the car, that the heroin wasn't his, and that he was just doing someone a favor. Vergara said he and Galvis took a bus to New York to retrieve the Buick.

Special Agent Ogden testified at trial about the statement he took from Galvis on September 17th. Galvis told him he was married with a small child and unemployed. Galvis agreed to Vergara's request to do him the favor of going to New York with him on a bus because he had nothing else to do. They went to a restaurant in Queens, where Galvis remained while Vergara located the vehicle on the street. Vergara came and got him at the restaurant, they went to the car, and Galvis drove it back to New Jersey with Vergara as his passenger.

Investigator Iurato was called as a trial witness by defendant Galvis on May 7, 1993, for the purpose of eliciting testimony that Iurato prepared an Affidavit in connection with the original criminal complaint filed in this matter on September 17–18, 1992, assisted by Special Agent Collier, and that the Iurato Affidavit memorialized that Officer Cottrell had told Collier or Iurato that he had seen Vergara ducking down to try to stuff the bag under the seat, but that there was no mention of Galvis doing so. Investigator Iurato also said he had prepared a case report that he didn't have in court, and counsel for defendant Vergara asked to be provided with a copy.

The parties rested at that point, the case report being unavailable, and closing statements began. The court charged the jury later on the afternoon of May 7, 1993.

On May 11, 1993, as the jury resumed deliberations, defendants sought an *in camera* inspection of Iurato's investigative report, which had been produced and marked Ex. J–8 (and later Ex. M–2 at the post-trial hearing.)[4] The *in camera* inspection was undertaken to determine whether the report contained discoverable material under *Brady/Giglio* or a statement of a defendant discoverable under Rule 16(a)(1)(A), Fed. R.Crim.P. It was the Iurato report, as mentioned above, that contained the first references to the heroin being found "under the seat" and to the fact that both defendants had been interrogated by Special Agent Collier and Investigator Espinal on the night of September 16, 1992, immediately after arrest. Previously, the prosecutor had stated that only Detective Rivera had interrogated Vergara on that night, and it had been stated that the only statement by Galvis had been the one given the next day. This led to the government's production of Exhibit M–1 at

---

**3.** The jury also heard the testimony of Officer Cottrell regarding his brief questioning of Galvis and Vergara at the vehicle stop relating to the traffic violation. Cottrell testified on May 6, 1993 that Galvis was the driver, that he dropped the license and registration papers, and that he had been in "Allison Park" for three hours and that he didn't know who owned the Buick he was driving. Cottrell testified that Vergara was the passenger, that he seemed very nervous, that they had been in Palisades Park for 1 hour, and that the Buick was his friend's vehicle, but he didn't know the name of the friend. He testified that he read both defendants their *Miranda* rights in English at the scene, and that Galvis understood but that Vergara responded, "No hablo

ingles," so he did not question him further at the scene. Defendants' motions to suppress their statements to Officer Cottrell were denied for reasons stated in the Opinion filed April 23, 1993 at 21–24.

**4.** The court made redactions to Ex. J–8 as a result of the *in camera* inspection to delete information not relevant to the defendants' actual statements. The redacted document became Ex. J–8A. One of the redacted paragraphs was restored to provide background information, yielding the two-paragraph document that became Ex. M–2 at the post-trial hearing.

the post-trial hearing, which was the Espinal Memorandum dated September 17, 1992, as discussed above.

The non-disclosed post-arrest statements of defendants Vergara and Galvis buttressed the defendants' position in this case. The substance of Vergara's remarks were much the same as in his September 17th statement that the jury heard at trial. The Iurato Report (Ex. M–2) reiterates that both individuals denied any knowledge of the heroin, which was already known from the other statements at trial. The Espinal Memorandum (Ex. M–1) gives details of the Vergara interrogation, which attributes statements to Vergara about being approached by the unknown male asking him to earn some money by going to New York to pick up a car, drive it back to North Bergen, and park the car with the keys inside; and Vergara repeated that he did not know there was anything in the vehicle when he retrieved it. As to Galvis, the Espinal Memorandum merely states that the agents "also conducted the questioning of Jorge William Galvis", whom Espinal had advised of rights in English. (Ex. M–1.)

### C. Disclosure under Rule 16(a)(1)(A)

The United States is required to disclose statements of a defendant under Rule 16(a)(1)(A), Fed.R.Crim.P., disclosure which includes, among other things, "that portion of any written record containing the substance of any relevant oral statement made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent...." There is a continuing duty to disclose such materials under Rule 16(c), Fed.R.Crim.P. This requirement is elaborated upon in the standard Order for Discovery and Inspection, which was filed in this case on October 16, 1992, and which provided in ¶ 1 in relevant part:

> Within ten (10) days from the date hereof, the United States Attorney and or one of his assistants and the defendant's attorney shall meet and confer, and the government shall:
>
> (a) Permit defendant's attorney to inspect and copy or photograph any relevant written or recorded statements or

confessions made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or may become known, to the attorney for the government;

The continuing duty of disclosure likewise exists under ¶ 3 of the Order for Inspection and Discovery. The portions of Exs. M–1 and M–2 containing the substance of defendant's oral statements of September 16, 1992, qualify as statements of the defendants for purposes of Rule 16(a)(1)(A) and ¶ 1 of the Order. The question remains whether Exs. M–1 and M–2 were known to the attorney for the government so that disclosure was required.

■ The Espinal Memorandum (Ex. M–1) was unknown to AUSA Wigler until May 19, 1993, a day before the post-trial hearing, according to AUSA Wigler's representations to the court on May 20, confirmed by Espinal's testimony. (Tr. 83:24–84:10.) Ex. M–1 was an internal memorandum which Investigator Espinal prepared for her supervisor in the Bergen County Narcotics Task Force, to justify overtime, not intended for outside distribution. (Tr. 80:17–81:18 and 82:7–18.) Special Agent Iurato confirmed that as the DEA case agent on the case, he first saw Ex. M–1 the day before the hearing. (Tr. 91:2–22.) Iurato was also an employee of the Bergen County Prosecutor's Office along with Inspector Espinal, and he didn't ask her to prepare a report and was unaware that she had written the internal memo. (Tr. 94:12–19.) Espinal had told Iurato that nobody had anything to say. (Tr. 94:17.) Iurato's failure to have gathered the Espinal Memorandum was understandable since he was unaware such a report existed and he had no reasonable basis for believing that it might exist. AUSA Wigler satisfied the prosecutor's duty of disclosure by disclosing Ex. M–1 on May 20, 1993, as soon as it came to his attention, and no violation of Rule 16(a)(1)(A) has occurred with respect to Ex. M–1.

■ The Iurato Memorandum (Ex. M–2), however, was within the prosecution's knowledge and the portion containing defendants' statements should have been disclosed before

trial. This case agent's report recited the substance of the defendant's statements. It was obviously known to Iurato, who had prepared it on September 17, 1992, although he did not sign it until November 13, 1992, and his supervisor, DEA Special Agent Timothy J. Ogden, approved it on November 14, 1992. (See Ex. M–2.) Agent Iurato recalled that he gave the statement to AUSA Wigler in the case jacket (Tr. 32:9–22), and he recalled seeing Ex. M–2 in court, either before the December, 1992 suppression hearing or before the trial in May, 1993. (Tr. 38:8–23.) Special Agent Collier also recalled seeing the Iurato Report (Ex. M–2) before, but was unsure when. (Tr. 60:20–61:15.) Accordingly, it is apparent that AUSA Wigler was aware of Ex. M–2 before trial, and that the prosecutor was obliged to turn over the portions of Ex. M–2 containing the defendants' statements, pursuant to Rule 16(a)(1)(A). If Ex. M–2 had been disclosed, its references to finding heroin "under the seat" and to the interrogation by Special Agent Collier would also have been disclosed.

### D. *Disclosure under Brady/Giglio*

We must next consider whether the failure to disclose the Iurato Report (Ex. M–2) and Special Agent Collier's knowledge of Patrolman Cottrell's contradictory statement about the manner of seizing the heroin violated the defendants' rights under the *Brady* doctrine.

Under the doctrine of *Brady v. Maryland,* the government has the ·duty to turn over evidence which is favorable and material to the accused, including information which would exculpate them or mitigate culpability, 373 U.S. at 87, 83 S.Ct. at 1196, as well as material which the defense might use to impeach an important witness, *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The defendants claim that a mistrial should be declared and a new trial granted because the prosecution suppressed material exculpatory evidence about the seizure of the drugs which is also strong impeachment evidence against Patrolman Cottrell. A new trial will be granted on these grounds if the defendants establish that (a) exculpatory information existed, as defined in *Brady, Giglio* and *Bagley, inter alia,*[5] (b) of which the prosecutor had actual or constructive knowledge,[6] (c) which was not produced to defendants, and (d) which was "material" in the sense that on the record as a whole the unavailability of the evidence for use at trial materially impaired the fairness of defendants' trial.[7] *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381; *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1975); *Hill,* 976 F.2d at 136.

#### 1. *Exculpatory Information*

First, this evidence in Ex. M–2 was exculpatory. The notion that the heroin may have been "under the seat," in whole or in part, as stated in Ex. M–2, supports defendants' claims of lack of knowledge of the existence of the heroin in the car that they were retrieving to New Jersey for an unnamed friend. Defendant Galvis could have been especially unaware of the bag and its contents if they were wholly or partially under Vergara's seat. The contraband under the seat would also contradict Officer Cottrell's

---

5. The Third Circuit has recently written: "Materials that must be disclosed are those that go [to] the heart of the defendant's guilt or innocence and materials that might affect the jury's judgment of the credibility of a crucial prosecution witness." *United States v. Hill,* 976 F.2d 132, 134–35 (3d Cir.1992) (*citing Giglio,* 405 U.S. at 154, 92 S.Ct. at 766, and *United States v. Higgs,* 713 F.2d 39 (3d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984)).

6. Constructive knowledge or constructive possession of information means "that although a prosecutor has no actual knowledge he should nevertheless have known that the material at issue was

in existence." *United States v. Joseph,* 996 F.2d 36, 39 (3d Cir.1993). A prosecutor should know information exists when that information was known to the "prosecution team." *United States v. Perdomo,* 929 F.2d 967, 970 (3d Cir.1991).

7. Stated differently, the evidence is "material" if there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different; a "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383.

testimony that he saw the bag in full view on the floor in front of the passenger's seat, and thus bring other essential elements of his testimony into question. Disclosure of Ex. M–2 would have led to discovery of Officer Cottrell's oral statements to Special Agent Collier.

Special Agent Collier's information—that Cottrell gave him a version of the search and seizure that strongly contradicted his testimony at the suppression hearing and trial as to location of the drugs and his ability to see the drugs in plain view—is also exculpatory. Special Agent Collier was definite and precise in his recollection of Officer Cottrell's statement of inability to see the drugs before he seized them. This second version could impeach the testimony of Patrolman Cottrell, who was the government's main witness. If one finds that he lied about his seizure of the drugs by seeing white power in the bags in plain view from outside the car, then one could find that he has lied about other critical details, such as his alleged observations of defendants' extreme nervousness or of their ducking down to attempt to hide the bag containing drugs or of the position of the bag in full view rather than partially under the seat.

## 2. *Prosecutor's Knowledge*

The prosecutor had actual knowledge of Ex. M–2, as discussed above, prior to trial, but failed to turn it over, perhaps mistakenly reading it as redundant to other information when in fact it contained potentially exculpatory information.

The prosecutor had constructive knowledge of Special Agent Collier's version of Patrolman Cottrell's search and seizure because Special Agent Collier specifically imparted this information—that the drugs were not in plain view when seized—to the initial Assistant U.S. Attorney on duty and other Assistant U.S. Attorneys on September 17, 1992, as discussed above. The case was shortly thereafter reassigned to AUSA Wigler, whose first day on the job occurred on the afternoon of September 17th. That AUSA Wigler has not been shown to have had actual knowledge of Collier's exculpatory information until just before the post-trial

hearing on May 20, 1993, does not undermine the knowledge requirement here. AUSA Wigler is held to have constructive knowledge because it was actually known by the earlier Assistant U.S. Attorney on this case. The "prosecution team" knew of Special Agent Collier's exculpatory information.

Constructive knowledge of this information is also shown, alternatively, by the triggering effect of defendants' requests for *Brady* and *Giglio/Bagley* exculpatory and impeachment information. This request was made in motions to compel production, which this court addressed in Part III of its Opinion filed April 23, 1993, at pp. 30–31. AUSA Wigler filed a response to the motion acknowledging the continuing obligation to produce *Brady* material and stating that no *Giglio/Bagley* impeachment information exists. *See id.* at 30. The court accepted these responses, which implied that AUSA Wigler had performed reasonable inquiry and search of the prosecution's records and became aware of no such information. In retrospect, it is clear that AUSA Wigler should have become sensitized to the importance of Ex. M–2 and he should have personally learned of the Collier information that was imparted to the predecessor AUSA. As in *Perdomo, supra,* where this exculpatory information was "readily available" to the Assistant U.S. Attorney, this court must be "unwilling to allow the prosecution to avoid *Brady* obligations by failing to take the minimal steps necessary to acquire the requested information," *United States v. Joseph,* 996 F.2d at 40 (discussing *United States v. Perdomo,* 929 F.2d 967, 969–970 (3d Cir.1991)).

## 3. *Non–Production of the Information*

There is no dispute that defendants were unaware of the existence of the Iurato Report (Ex. M–2) and of the Collier information, nor could they reasonably have been expected to have been led to such information from the materials that had been discovered. The disclosure in Ex. M–2 that there had been interrogation of both defendants after their arrest by Special Agent Collier and Investigator Espinal could have also led to the discovery of the Espinal Memorandum

(Ex. M–1) of which they remained unaware until the post-trial hearing.

### 4. *Materiality of Exculpatory Information*

This court must assess whether under all the circumstances there is a reasonable likelihood that this new exculpatory evidence would raise a reasonable doubt about defendants' guilt.

At the trial, the defendants' knowledge that they were in possession of heroin, and that they were knowingly conspiring to do so, was the key area of dispute. While the defendants, in post-arrest statements to law enforcement authorities, disclaimed such knowledge and portrayed themselves as innocent persons who were doing a favor, there was substantial evidence of their guilt introduced by the trial.

As summarized in Mr. Wigler's closing statement to the jury, police seized two beepers from Galvis plus $889 in cash, despite his being unemployed. From Vergara, they seized one beeper and $611 in cash plus an address book he tore up while in custody which was subsequently reconstructed. The extreme nervousness of both defendants when Officer Cottrell confronted them, the furtive gestures of bending down in their vehicle when Cottrell was behind them, Vergara's destruction of his address book, the efforts the defendants made to conceal the bag under the seat, and the suspicious explanation they gave for the purpose of their trip, elevated the proofs to a point establishing guilt beyond a reasonable doubt in the government's view, and in the eyes of the jury.

Although both defense counsel argued that the Cottrell version of the seizure was a fabrication, they had no real evidence that something else had occurred that would bring Cottrell's entire credibility into question. Mr. Booth, on behalf of defendant Vergara, speculated that the most likely scenario was that the heroin was not in plain view, that Cottrell lied about Vergara and Galvis ducking down multiple times, and that if that did happen Officer Cottrell would naturally become concerned with his safety, draw his weapon and order the two men out of the car to investigate what they were doing. Mr. Booth further speculated that Cottrell searched the vehicle until he found the contraband, but that he fabricated his testimony about his plain view of the drugs. If the bag was not in the middle of the floor in front of the passenger, as Officer Cottrell swore it was, then these defendants may well have been unaware that their errand had a guilty purpose, according to the arguments of both counsel.

The Collier information and the Iurato Report would have provided such ammunition to the defendants to undermine Officer Cottrell's credibility on key observations he claims to have made. If the jury had heard Special Agent Collier's testimony and credited it, for example, they would find that Officer Cottrell lied in court about seeing the drugs in plain view. Did he also embroider testimony about the defendants' demeanor, which he subjectively described as extreme nervousness? Did he stretch the truth about both defendants ducking down on multiple occasions to the vicinity of the bag? Did he lie to the jury, and perhaps even to Special Agent Collier, about the bag not being located fully under the seat?

The new exculpatory information would not have changed the existence of the beepers and a moderate amount of cash, totaling $1,500, nor would the new information change whatever inferences flow from Vergara's attempted destruction of his address book. But the undermining of Officer Cottrell's credibility could open the door to the jury's thoughtful consideration of innocent, non-drug related reasons for the cash, beepers and Vergara's address book, sufficient to raise a reasonable doubt.

These defendants face extremely significant charges, with grave penalties in the event of conviction. Where there is a likelihood that the exculpatory information could reasonably undermine the basis of finding that these defendants had knowledge of their possession of heroin beyond a reasonable doubt, their rights to a fair trial require setting aside their convictions and holding a new trial.

The Supreme Court does not require that the trial court be certain that a retrial after a *Brady* violation will result in acquittal.

What is required, and what this court finds, is that under all the circumstances of this case, there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

Therefore, the non-disclosure of exculpatory information in the knowledge of the prosecutor was material in undermining confidence in the guilty verdicts reached against both defendants on both counts, and a new trial must be ordered.

### III. *Judgment of Acquittal Denied*

■ Finally, this court's finding of a *Brady* violation requiring a new trial does not determine or imply that the prosecutor knowingly presented perjured testimony from Officer Cottrell. Defendant Galvis has argued that a conviction obtained by the knowing use of false testimony is fundamentally unfair and charges must be set aside or the case dismissed, citing *United States v. Agurs, supra; Donnelly v. De Christoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1973); *Giglio v. United States*, supra; *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1966); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); and *United States v. Perdomo, supra*. In the present case it is not clear that Officer Cottrell offered perjured testimony (since a jury must still decide whether Special Agent Collier's recollection is accurate). Further, there is no indication that AUSA Wigler knew of the Collier information when he presented Officer Cottrell's testimony. Moreover, as explained above, there was ample evidence at trial to support the convictions that were entered, and acquittal with dismissal of charges would be inappropriate. Accordingly, the court denies defendants' motion for judgment of acquittal under Rule 29(c), Fed.R.Crim.P., while granting a new trial to cure *Brady* violations.

### IV. *Conclusion*

For the foregoing reasons, defendants' motion for judgment of acquittal will be denied but a new trial will be granted. The accompanying Order is entered.

### ORDER

This matter having been brought before the court upon motions by defendants for judgment of acquittal under Rule 29(c), Fed. R.Crim.P.; and

Having considered the arguments and submissions of counsel and testimony at a post-trial hearing; and

Having found that a judgment of acquittal should be denied but that a new trial is required in this case under the doctrine of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, for reasons stated in the Opinion of today's date;

IT IS this 5th day of January, 1994 hereby

ORDERED that defendants' motion for judgment of acquittal is DENIED, but a new trial is hereby GRANTED, and the verdicts previously returned herein on May 11, 1993 are hereby set aside pending a new trial; and

IT IS FURTHER ORDERED that defendants' detention without bail pending the new trial is continued, pending further Order of the court.