DECISION
This is an appeal by defendant, Keith Harris, from a judgment of the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of attempted murder and felonious assault.
On July 29, 1998, Amy Beekman was hosting a "pot luck" barbeque at her apartment at 2074 Hampstead. Beekman's guests included her boyfriend, Kareem Anderson, and her cousin, Jennifer. Also present at the apartment were Shawn Bates, a friend of Kareem, and Tara Kibler, a friend of Beekman.
At approximately 10:00 p.m., Jennifer and Tara took a walk because Jennifer had become upset about something. During the walk, Jennifer and Tara met up with Gary Silongi, who was just returning home from work. The three went inside Silongi's residence for a brief period. During this time, Tara called Beekman and asked if they could bring Silongi over to Beekman's apartment. Beekman assented, and Tara, Jennifer and Silongi then walked over to the apartment.
When they arrived, Shawn, who had been drinking, became upset because Jennifer was on Silongi's shoulders, "piggy-back" style. Silongi testified at trial that, when he entered the apartment with Tara and Jennifer, Shawn pointed a gun at his face. Silongi further stated that Kareem "came beside me with a potato knife." (Tr. 228.) Silongi left the apartment and returned to his residence.
Tara and Jennifer later called Silongi to apologize. A short time later, Silongi received a call from Kareem threatening "to shoot up my house." (Tr. 229.) Silongi subsequently received another call, during which Kareem "said he was sorry." (Tr. 230.)
Silongi was an acquaintance of both the defendant and John "Xavier" Carr (hereafter "Xavier"). The defendant and Xavier shared a motel room at the Suburban Lodge. On July 30, 1998, at approximately 11:30 p.m., the defendant finished his work shift at the Olive Garden restaurant and returned to his motel room. Xavier arrived at the motel a short time later.
Beekman testified that Xavier phoned her apartment that night and talked with Jennifer. A short time later, Xavier and the defendant drove to Beekman's apartment, and Xavier spoke with Jennifer. Xavier testified that he went to see Jennifer because "[s]he was mad at me." (Tr. 195.) Jennifer was apparently upset with Xavier because he had not come over to see her earlier that day. Xavier testified that, when they arrived at Beekman's apartment, "Shawn B. pulled his shirt off showing off his gun." (Tr. 195.) According to the testimony of Kareem, the weapon, a "block High Point .9," was not loaded. (Tr. 23.) Jennifer then intervened, and said that there was no problem. After Xavier spoke with Jennifer for a short while, Xavier and the defendant got in their car and went back to the Suburban Lodge.
Jennifer later telephoned Xavier and apologized about the incident. Jennifer asked Xavier and the defendant to come back to Beekman's apartment. Sometime after this call, Silongi went over to the residence of Xavier and the defendant. Xavier, Silongi and the defendant then returned to Beekman's apartment at approximately 4:00 a.m.
When Xavier, Silongi and the defendant arrived at Beekman's apartment, Shawn and Kareem went outside to meet them. Prior to going outside, Kareem had obtained the 9 mm. weapon previously displayed by Shawn; Kareem was now carrying the handgun in the back waistband of his sweat pants. Beekman told the group to get away from her residence, and the five men then began walking toward the parking lot of the apartment complex.
There was conflicting testimony at trial regarding the events that next transpired. Kareem testified that he and Xavier began to have words, and Kareem told Xavier to take his hand out of his pocket. Kareem testified that he began to scuffle with Xavier, and the 9 mm. handgun fell out of Kareem's shorts. Kareem stated that his main concern was to grab Xavier's pocket, because Xavier "had a gun." (Tr. 30.) The two were wrestling on the grass, with Kareem on top of Xavier, when Xavier began to scream, "somebody get him off of me." (Tr. 30.) Moments later, Kareem thought somebody was punching him in the back, and he did not realize at the time that the defendant had stabbed him from behind.
Both Tara Kibler and Amy Beekman testified at trial that they had come out of the apartment and observed the fight. Kibler testified that she saw Kareem on the ground "beating some guy up and I saw some guy at his side." (Tr. 100.) Kibler testified that, "then * * * something happened. I didn't see it. But Kareem was on the ground * * * moving around and stuff. And then I went over there and the guys ran off." (Tr. 100.) When Kibler walked over to Kareem, she noticed that he was bleeding. Kibler testified that she did not see Kareem point a weapon at anybody during the incident.
Beekman testified that she observed Kareem and Xavier scuffling in the parking lot. Kareem was on top of Xavier at one point, and Xavier was asking the defendant for help. The defendant came over and began hitting Kareem repeatedly. When Beekman walked closer to Kareem, she realized that the defendant had been stabbing Kareem. As Kareem was attempting to get up, "Xavier pulled out a gun and it was pointed at Kareem." (Tr. 128.) Beekman described the weapon as a "small silver chrome looking gun." (Tr. 128.)
Beekman further testified that, when Kareem initially exited the apartment to confront the other individuals, he "had picked up a black gun and put it in the back of his pants." (Tr. 129.) Beekman stated that the gun was not loaded. According to Beekman, she did not observe Kareem raise the weapon at any time during the confrontation.
The defendant testified on his own behalf, and he stated that, as Kareem and Xavier were wrestling on the ground, Kareem had a gun in his hand. The defendant stated that, during this time, he spotted a knife on the ground, picked it up and "stabbed Kareem in the back to get him off." (Tr. 169.) According to the defendant, his purpose in stabbing Kareem was to "get him off Xavier so he wouldn't kill him." (Tr. 171.)
John "Xavier" Carr also testified on behalf of the defendant. Xavier testified that, as the group was walking toward the parking lot, he heard a clicking sound, and "a gun come to my face." (Tr. 198.) Xavier testified that Kareem was holding a gun. Xavier was scared, and he grabbed Kareem's wrist. Shawn then "pushed us and we fell on the ground." (Tr. 199.) Kareem "said he'll kill me, three times." (Tr. 199.) Xavier grabbed for the gun. He testified that, "as I'm throwing the gun, Keith, I guess got on his back. And as far as I know, they said he stabbed him. I didn't see Keith stab him at all." (Tr. 199.) Xavier and the defendant then ran to their residence at the Suburban Lodge, where they were arrested a short time later by police officers.
Silongi testified that, at the time he and Xavier and the defendant arrived at Beekman's apartment, Kareem "came out drunk," and "[t]old us we're not coming in the house. Take it out in the yard." (Tr. 231.) Silongi testified that, as they were walking toward the parking lot, Kareem pointed a gun in Xavier's face and said, "I'm going to kill you." (Tr. 232.) Xavier grabbed the gun and Xavier and Kareem began wrestling for the weapon. Kareem told Shawn to "get the big guy," meaning Silongi. Shawn came at Silongi with a knife. Silongi took the knife from Shawn and "knocked him out." (Tr. 233.) Silongi then took off running while the others were fighting for the weapon. Silongi testified that, as he was leaving the scene, Kareem still had a weapon in his hand.
Following deliberations, the jury returned verdicts finding defendant guilty of both counts of the indictment. The trial court sentenced defendant by judgment entry filed on November 16, 1999.
On appeal, defendant sets forth the following four assignments of error for review:
Assignment of Error No. 1:
 Defendant-Appellant was denied his right to due process and a fair trial under U.S. Const. amend. V and XIV and Ohio Const. art. I, § 16 as a result of the prosecutor's suppression of the alleged attempted murder victim's perjury before the same grand jury which had returned the indictment in this case. There is a reasonable probability that had the evidence of the witness' perjury been disclosed in a timely fashion to defense counsel for impeachment purposes, the result of Defendant-Appellant's trial would have been different.
Assignment of Error No. 2:
 Defendant-Appellant was denied his right to the effective assistance of counsel under U.S. Const. amend. VI and XIV and Ohio Const. art. I, § 10 as a result of trial counsel's errors denying him a meaningful opportunity to present his affirmative defense of defense of another to the charges of attempted murder and felonious assault. These errors included the failure to object to the trial court's erroneous and incomplete jury instruction on the privilege to employ deadly force to defend a third person, the failure to request a limiting instruction forbidding the jury from considering the unsworn out-of-court statements of the defense witnesses for any purpose other than impeachment, and the failure to object to the improper and misleading remarks of the prosecuting attorneys during closing arguments.
Assignment of Error No. 3:
 The court of common pleas committed plain error and denied Defendant-Appellant his right to due process and a fair trial under U.S. Const. amend V and XIV and Ohio Const. art. 1, § 16 by giving the jury an erroneous instruction that a defendant has a privilege to use deadly force to defend a third person only if the person defended has a reasonable and honest belief he is in imminent danger of death or serious bodily injury, by omitting any language in the affirmative defense instruction directing the jury to return a verdict of not guilty if the defendant proved all of the elements of the affirmative defense of defense of another, and by failing to give a limiting instruction directing the jury that the unsworn out-of-court statements of the defense witnesses could be considered for impeachment purposes only and not for the truth of the matter asserted.
Assignment of Error No. 4:
 Defendant-appellant's conviction is not supported by sufficient evidence on each and every element of the crime of attempted murder as required by the Due Process Clause of U.S. Const. amend. V and XIV. Alternatively, his conviction is against the manifest weight of the evidence and should be reversed under authority granted to the court of appeals by Ohio Const. art. IV, § 3(B)(3).
Under his first assignment, defendant contends that he was denied his right to due process and a fair trial because of the prosecutor's suppression of the victim's perjured testimony before the grand jury.
The record indicates that, subsequent to the jury's verdicts, the court granted a request by defendant for the release of the grand jury testimony of the stabbing victim, Kareem Anderson. The prosecutor noted on the record that, at trial, Kareem Anderson testified that "he had a gun when he came out of the door of the apartment." (Tr. 348.) The prosecutor further noted that, "[a]fter reviewing the grand jury testimony, it's my understanding he indicated he didn't have a gun." (Tr. 348.)
The trial judge then noted to defense counsel on the record that, "I was made aware that it appears that there was perjury in the trial on the merits." (Tr. 349.) The trial judge further stated:
 It may be an interesting issue. I at least want you to have it so that issue can be raised. But I can also review the testimony of what was done at trial. And what was done at trial was I believe an admission that he had the gun. So the fact that he perjured himself and said he didn't have the gun in the grand jury, the worse case scenario is he didn't have a gun for your client. The better case scenario, he did have a gun. And that's what came out at trial. It could have been used for purpose of impeachment and whether a jury would have believed the matter is something that should and can and should be raised. [Tr. 349-350.]
Defendant contends that the record demonstrates a failure to disclose favorable evidence in violation of Brady v.Maryland (1963), 83 S.Ct. 1194. Defendant maintains that the evidence at issue was "material," and thus this court should enter a judgment of acquittal due to the state's failure to disclose this evidence.
Pursuant to the doctrine of Brady, supra, the prosecution has a duty to provide the defense with evidence favorable to the accused where such evidence is "material" either to guilt or punishment, irrespective of good faith or bad faith of the prosecution. Id. at 1196-1197. The rule set forth in Brady "is based on the requirement of due process." United States v. Bagley (1985), 105 S.Ct. 3375,3379. Further, "[i]mpeachment evidence, * * * as well as exculpatory evidence, falls within the Brady rule. * * * Such evidence is `evidence favorable to an accused,' * * * so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." Id. at 3380.
At the outset, we note that Ohio law recognizes the admissibility of grand jury testimony for limited purposes, including impeachment. See State v. Greer (1981), 66 Ohio St.2d 139,151 (pertinent grand jury testimony of witness should have been given to defendant where defense counsel established particularized need for grand jury testimony of state's witness to be used for impeachment purposes). Although grand jury testimony of a witness may be admissible for impeachment purposes, we must further consider whether the testimony at issue was material.
The United States Supreme Court has noted that, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles v.Whitley (1995), 115 S.Ct. 1555, 1566. Thus, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. Further, "[a] `reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression `undermines confidence in the outcome of the trial.'" Id., quoting United States v. Bagley
(1985), 105 S.Ct. 3375, 3381.
Defendant argues that one of the key issues for the jury's resolution was whether Kareem or the defendant was telling the truth regarding Kareem's actual possession of a handgun immediately prior to the stabbing. Defendant maintains that the reasonableness of defendant's use of deadly force against Kareem rested primarily upon defendant's perception of the immediacy of the risk that Kareem was going to shoot Xavier with Shawn's 9 mm. handgun. Defendant notes that Kareem testified at trial that he had lost possession of the handgun well before he was stabbed by defendant, and that the handgun was no longer within reach. Defendant asserts that proof that Kareem had previously lied under oath with respect to denying possession of the handgun at any time on July 30 would have destroyed his credibility. Defendant further contends that defense counsel could have also explored the fact that the witness was on probation at the time of the incident, and questioned Kareem regarding the extent to which his fear of revocation and a potential prison sentence influenced his account of the events at issue.
In the present case, it is undisputed that one of the key witnesses for the prosecution provided testimony before the grand jury that was directly contrary to his testimony at trial. Specifically, during the grand jury proceedings, Kareem Anderson denied having a gun during the incident. He testified that "the gun [belonging to Shawn] never went out of the house." (Tr. 6.) The witness further stated before the grand jury that, "after I was stabbed I guess the gun was still in the house, and since they stabbed me and not him they said that I had the gun." (Tr. 7.)
Upon review, we believe the grand jury testimony presented strong impeachment evidence in light of the fact that the jury's assessment of Kareem Anderson's credibility was crucial to the outcome of the trial. One federal court has noted that, "[i]n light of the axiomatic importance of truthful testimony for the integrity of judicial proceedings, undisclosed evidence of a witness' prior perjury has a significant impact on the fairness of the trial." United States v. Cuffie (C.A.D.C. 1996), 80 F.3d 514,518. It has further been held that "depriving a defendant of the opportunity of utilizing damaging and impeaching evidence against an `essential' witness should be considered in the due process analysis." Schledwitz v. United States (C.A.6, 1999),169 F.3d 1003, 1016, citing Kyles, supra. In the instant case, had defense counsel been aware of the victim's grand jury testimony, counsel could have subjected this "essential" witness to cross-examination designed to undermine his credibility and raise doubts as to whether he might have perjured himself at trial as to other details of the incident. As noted by defendant, during closing argument the prosecution placed emphasis on the veracity of Kareem's account of losing possession of the handgun (which the prosecutor termed "pretty reasonable testimony"). (Tr. 275.) Further, the prosecutor challenged the jurors to contrast Kareem's testimony against the testimony of "defendant and his friends who have already lied to both the police and on the stand." (Tr. 306.) Defendant asserts that it is highly unlikely that the prosecution would have made such comparisons if their key witness' perjury had been exposed at trial.
Under the circumstances of this case, we conclude that "the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict.'" Cuffie,supra, at 517, quoting United States v. Smith (C.A.D.C. 1996),77 F.3d 511, 515. Because the victim's testimony was critical to defendant's conviction, "the jury's assessment of * * * [Anderson's] credibility was crucial to the outcome of the trial." UnitedStates v. Shaffer (C.A.9, 1986), 789 F.2d 682, 688-689. Finding that the evidence at issue was material and subject to disclosure, we conclude that the state's failure to disclose the impeachment evidence "undermines confidence in the outcome of [defendant's] trial." Bagley, supra, at 3381.
We note that, although defendant seeks a judgment of acquittal, the record in this case is insufficient to indicate that the testimony at issue was willfully suppressed by the state such as to support a finding of prosecutorial misconduct. Further, as will be discussed infra, because there was sufficient evidence to support defendant's convictions, we do not find a judgment of acquittal to be appropriate; rather, we conclude that this matter should be remanded for a new trial to cure the Brady
violations. See United States v. Galvis-Valderamma (D.C.N.J. 1994), 841 F. Supp. 600, 610.
Based upon the foregoing, defendant's first assignment of error is sustained to the extent that this matter is to be remanded for a new trial.
We will next address defendant's fourth assignment of error. Under this assignment of error, defendant challenges his conviction for attempted murder as not supported by sufficient evidence and as against the manifest weight of the evidence.
In considering whether the state presented sufficient evidence to support a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. In order to sustain a conviction for attempted murder, under R.C. 2923.02(A), the state is required to show that the defendant purposely or knowingly engaged in conduct which, if successful, would result in the death of another.
Defendant contends that there was insufficient evidence for the jury to have found that he had the requisite intent to kill the stabbing victim. We disagree.
Under Ohio law, "[a]n intent to kill may be presumed where the natural and probable consequence of a wrongful act is to cause death, which may be inferred from use of a weapon having a tendency to destroy life by one engaged in a fight with another."State v. Luster (July 25, 1985), Franklin App. No. 84AP-729, unreported. In the present case, in viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence by which a rational jury could have found defendant guilty of attempted murder beyond a reasonable doubt. At trial, the victim testified that he was stabbed multiple times by the defendant. Dr. Phillip Taylor, a trauma surgeon at Riverside Surgical Associates, testified that he treated Anderson following the incident. Dr. Taylor recalled at least two stab wounds to the victim. One of the stab wounds was to Anderson's left chest, causing a partial collapse of his lung. The force of this particular wound penetrated Anderson's diaphragm and perforated his stomach. Dr. Taylor testified that the injuries Anderson sustained were life threatening, and that death would have been imminent had the victim not obtained immediate medical treatment. Here, the jury could have inferred intent to kill on the part of defendant based upon the use of a deadly weapon, the location of the wounds and the force necessary to penetrate vital organs.
While we conclude that there was sufficient evidence to support defendant's conviction, defendant's further contention that his conviction is against the manifest weight of the evidence is rendered moot by our disposition of the first assignment of error, remanding this matter for a new trial. Accordingly, defendant's fourth assignment of error, as it relates to the sufficiency challenge, is overruled, and the assignment of error is otherwise rendered moot.
Similarly, defendant's second assignment of error, in which defendant contends that he was denied effective assistance of counsel for various omissions of counsel, is rendered moot.
Finally, our disposition of the first assignment of error also renders defendant's third assignment of error technically moot; however, because the issue may arise on retrial, we will address, in the interests of judicial efficiency, defendant's argument that the court gave an erroneous jury instruction. Specifically, defendant contends that the trial court's instruction on the affirmative defense of "defense of another"[1] was incorrect.
The record indicates that the trial court gave the following instruction:
 * * * When somebody claims to defend another person, the defendant which is what the defendant has claimed in this case the defendant stands in the shoes of the person he is claiming to defend.
 When I'm defining this for you and I use the term "he" or "the defendant" or whatever term I use, I want you to know that you're dealing with a situation in which the person who is being defended in this case must have all these things present for that person before the defendant can be found to have engaged in the appropriate self-defense defense.
 So we are using the person who is being defended as the person in these statements. For example, he or she was not at fault in creating the situation; we are talking about the person that sought to be defended was not at fault in giving rise to this situation. And that's the first thing that must be proved by a preponderance of the evidence.
 It must also be proved that he had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm and that his only means of retreat or escape or withdrawal from the danger was by the use of this deadly force.
 It must also be shown that he did not violate any duty to retreat. Now that's the third element.
 If the defendant in this case does not prove any one of the first two elements, then the defendant has a duty to retreat. So the duty to retreat is dependent on proving the (A) factor or the (B) factor. And if they haven't proved those first two, then there's a duty to retreat. Now words alone do not justify the use of deadly force. Resort to such force is not justified by abusive language, verbal threats or other words no matter how provocative. (Tr. 329-331.)
Defendant contends that the prosecution expended great effort during the trial to undermine defendant's affirmative defense (of defense of another) by attempting to persuade the jury that Xavier, the person being defended, did not have reasonable grounds to believe, and did not have an honest belief, that he was in imminent danger of death or serious bodily harm. Defendant argues that this court has previously rejected the position advanced by the prosecution and embodied in the trial court's charge that the right to come to the defense of another turns on the existence of a subjective belief of death or serious bodily injury on the part of the person being defended.
In State v. Harris (1998), 129 Ohio App.3d 527, 537, this court held that, under Ohio law, "it is the defendant's good faith and reasonable belief in the imminent danger to the person defended and the concomitant need for the use of force, not the knowledge or belief of the person being defended, that warrants the instruction on the privilege." In the present case, we agree with defendant's contention that the instruction provided was erroneous. Assuming the jury felt that Xavier did not have a reasonable belief of death or serious bodily injury and never considered whether defendant had a reasonable belief that Xavier was in imminent danger, the erroneous instruction submitted prevented the jury from correctly applying the law and constituted plain error. Finally, defendant's remaining contention under his third assignment of error, that the court erred in failing to give a limiting instruction regarding the purpose for which Xavier's and Silongi's out-of-court statements could be used, is rendered moot. Thus, we sustain defendant's third assignment of error to the extent provided above.
Based upon the foregoing, defendant's first and third assignments of error are sustained to the extent provided above, the fourth assignment of error is overruled, and the second assignment of error is rendered moot. Accordingly, the judgment of the trial court is reversed and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this opinion.
[1] We note that defense counsel did not object to the trialcourt's instruction.