715 A.2d 281

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. LESLIE A. NELSON, A/K/A GLEN NELSON,
DEFENDANT–APPELLANT.

Argued March 3, 1998—Decided July 30, 1998.

488

*Stephen W. Kirsch* and *Michael B. Jones*, Assistant Deputy Public Defenders, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney).

*Deborah C. Bartolomey*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General of New Jersey, attorney).

O'HERN, J.

This is a capital murder case. There must be a new sentencing because the State withheld evidence favorable to the defense and

material to the jury's determination whether defendant deserved the death penalty.

## I

### A.

Defendant Leslie Nelson has pled guilty to the killing of two police officers, Investigator John McLaughlin and Officer John Norcross, and to the second-degree aggravated assault of a third officer, Detective Richard Norcross, the brother of Officer John Norcross. The killings and the assault occurred on April 20, 1995, during a shootout with the officers, who had come to defendant's home with a search warrant.

The standoff was central to one of the mitigating factors in defendant's case. Investigator McLaughlin, who worked for the Camden County Prosecutor's Office, and Investigator Carmelo Garcia, of the Division of Youth and Family Services, went to defendant's home on the morning of April 20 to respond to a complaint that defendant had fondled her niece and threatened her niece with a shotgun. Haddon Heights Police Detectives Robert Griffith and Richard Norcross accompanied the two investigators.

Defendant lived with her elderly parents in Haddon Heights. Defendant's van was parked outside of the home when the police arrived. When no one answered the door, the officers had their dispatcher call the home. Defendant answered, told the dispatcher she would not open her door, then hung up. The dispatcher called again and persuaded defendant to open the door by telling her the officers were investigating a problem with the van.

After opening her door, defendant was reluctant to cooperate with the officers. At first she insisted on speaking only through the screen door. After a time, defendant agreed to allow Investigator McLaughlin inside the home. When McLaughlin would not enter alone, defendant agreed to let Garcia inside as well. The other officers remained outside.

Once inside, McLaughlin and Garcia spoke to defendant for approximately ninety minutes in her living room. The conversation was generally calm. Defendant, however, became upset and raised her voice when the officers told her that she had been accused of committing a sexual crime. In the course of the discussion the officers learned that defendant had a knife and a shotgun and that she kept the shotgun locked in her bedroom closet. Defendant would not allow the officers to search her bedroom, although her mother allowed them to search the rest of the house. The search of the house, including the part of defendant's bedroom the officers could see through defendant's partly opened bedroom door, did not reveal any evidence of crime.

When the officers went downstairs, Investigator McLaughlin went outside. While McLaughlin was outside, Investigator Garcia noticed that defendant was very upset. She paced from window to window to see what the police were doing outside. Garcia described defendant's behavior at this stage as "paranoid." McLaughlin returned and asked defendant about her knife. Defendant at this point agreed to allow the officers to see her bedroom. In the room the officers saw a number of bullets and a four-inch lock-blade knife.

As the officers left the house, defendant asked about their plans for further investigation. Garcia told defendant that his part of the investigation was over, but McLaughlin said that he would have to discuss the matter with his superiors. Defendant told them that she would kill herself if she had to go to jail.

Norcross decided to obtain a warrant to search defendant's bedroom for weapons. Believing that "things might get hairy" when they served the warrant, the officers asked for a "no-knock" provision in the warrant. A municipal court judge issued the "no-knock" warrant. Upon further consideration, the officers decided not to use the "no-knock" provision. They believed that the relationship that McLaughlin developed with defendant would make the search go smoothly.

At about 2:00 p.m. that same day, six officers, including McLaughlin and Detective Richard Norcross, went to defendant's home to conduct the search. McLaughlin and Norcross went to the door, while the other officers remained outside. According to the testimony of Detective Norcross, defendant's mother answered the door and called upstairs to defendant that McLaughlin had returned. Defendant called back, "What the f—— does he want?" McLaughlin, in a "soothing tone," told defendant that he needed to ask some more questions. McLaughlin attempted to coax defendant down the stairs, speaking to her from the foot of the stairway as defendant stood at the top. Defendant asked if the officers had a warrant for her. McLaughlin explained that they did not have an arrest warrant, but they did have a warrant to search her bedroom. Just then Detective Norcross heard defendant begin to run, and he saw McLaughlin reach for his firearm and run up the stairs after defendant. When McLaughlin reached the top of the stairs and turned toward defendant's bedroom, defendant fired a rifle at him. McLaughlin fell, fatally wounded.

Detective Norcross continued up the stairs after Investigator McLaughlin fell. When he reached the top, defendant shot him, hitting him in the chest, hand, arm and leg. Norcross fell and slid back down the stairs. As he slid, defendant leaned out over the railing and shot Norcross once more in the leg. She then ran to the top of the steps and began to follow Norcross down. Defendant's mother called to her to stop, and she stepped between defendant and the detective. Norcross struggled to his feet and left the house through a side door.

Defendant went to a second-floor window and began firing at the officers outside. Ten or fifteen minutes after the gunfire began, defendant fatally shot Officer John Norcross, who was standing across the street from defendant's home.

The Haddon Heights dispatcher called defendant's home soon after John Norcross was shot. Defendant told the dispatcher that she did not want police officers searching her room or taking her

to jail. After a long negotiation conducted by telephone, defendant eventually surrendered.

## B.

A Camden County Grand Jury indicted defendant on two counts of knowing and purposeful murder by her own conduct, eight counts of first-degree attempted murder, third-degree unlawful possession of an assault firearm, and second-degree possession of a firearm for an unlawful purpose. Defendant pled guilty to the two capital murder counts and to second-degree aggravated assault of Detective Richard Norcross and was convicted of those charges on the basis of her plea.

At the sentencing trial, the State asserted the following aggravating factors in connection with the murder of Investigator McLaughlin: 1) the murders created a grave risk of death to Detective Norcross (the "grave risk" factor); 2) each murder was committed for the purpose of escaping detection, apprehension, trial, punishment, or confinement for the unlawful possession of a firearm (the "escape detection" factor); 3) each murder was committed while defendant was engaged in the murder of the other officer (the "other murder" factor); and 4) each murder occurred while the officers were engaged in the performance of their official duties (the "public servant" factor). For the murder of John Norcross, the prosecution submitted only the escape detection, other murder, and public servant factors. It did not submit the grave risk factor.

Defendant countered with three mitigating factors for both murders: 1) she was "under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution" (the "emotional disturbance" factor); 2) her "capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law was significantly impaired as the result of a mental disease or defect, but not to a degree sufficient to constitute a defense to prosecution" (the "impaired capacity" factor); and 3) "any other factor that the jury might find

relevant to her prospects of rehabilitation or to the circumstances of the offenses, including [her] contention that the ... officers [who came to her house] had inadequate training, preparation, and support from the Camden County Prosecutor's Office and from the Haddon Heights Police Department for dealing with a disturbed person, particularly one known to possess a firearm" (the "catch-all" factor).

Defendant's mitigating evidence centered on the mental illness she suffered as a result of years of painful doubt about her sexual identity. Defendant began life as a male named Glen Nelson. In 1986, defendant consulted a Colorado doctor about sexual reassignment. The doctor advised him to begin the sex-change process by taking estrogen and progesterone. Following a nineteen-day commitment to a mental hospital in 1988, defendant was diagnosed with severe depression and with schizoid and antisocial tendencies.

In July 1989, defendant underwent psychological testing to determine if he would be a good candidate for sex-change surgery. The test indicated that defendant may have suffered from a depressive disorder, a dysthymic disorder, a major affect disorder or paranoia. He was not approved for the sex-change operation, but he began taking estrogen and progesterone. Defendant had breast augmentation surgery in May 1991, changed his name to Leslie, and began to live and dress as a woman. In September 1991, one of defendant's doctors described defendant as having "severe psychological problems." Still, defendant's doctors approved the sexual reassignment, in part because they feared defendant would commit suicide if he did not have the surgery. Defendant had the operation in May 1992.

After the sex-change operation, defendant's depression persisted. She developed a fixation or transference on a Browning handgun that she had bought, along with a semi-automatic assault rifle, in early 1989. As defendant's depression worsened, her obsession with guns deepened. Her bedroom, where she would spend hours polishing the guns, took on a surreal significance. A

defense psychiatrist testified that her deteriorating mental condition caused an abnormal reaction to the threat of the police entering her bedroom.

## C.

With respect to the murder of Officer John Norcross, the jury unanimously found the "escape detection," "other murder," and "public servant" aggravating factors. It unanimously rejected the "emotional disturbance" and "impaired capacity" mitigating factors, and it voted nine to three to reject the "catch-all" factor. The jurors were unanimous in declaring, beyond a reasonable doubt, that the collection of aggravating factors, and each aggravating factor in isolation, outweighed the mitigating factors.

In connection with the murder of Investigator McLaughlin, the jury unanimously found three of the four proffered aggravating factors: the "escape detection" factor, the "other murder" factor, and the "public servant" factor. Only ten of the twelve jurors found the "grave risk" factor. The only mitigating factor the jury was unanimous in finding was the "emotional disturbance" factor. The jurors voted ten to two in rejecting the "impaired capacity" factor and eight to four in rejecting the "catch-all" factor. The jurors could not unanimously agree that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.

The trial court sentenced defendant to death for the murder of Officer John Norcross and to life in prison with thirty years of parole ineligibility for the murder of Investigator McLaughlin. The court further sentenced defendant to a consecutive term of ten years in prison with a five-year parole bar for the second-degree aggravated assault of Detective Richard Norcross.

After the trial, it was revealed that Detective Richard Norcross, who had followed McLaughlin up the stairs and who was injured in the siege, had filed a civil suit against the county and municipal authorities. His tort claim alleged that the Borough of Haddon Heights and the Camden County Prosecutor's Office acted in a "palpably unreasonable" manner in "failing to provide proper

training and instruction to ensure the safety of the Haddon Heights Police Officers" who served the search warrant on defendant. Norcross claimed that the officers' conduct had caused Leslie Nelson to react as she did and injure him. The complaint was served on the County Prosecutor's Office on May 8, 1997, which was the seventh day of the ten-day sentencing phase. Two years before serving the complaint, on July 14, 1995, Detective Norcross sent notice of his claims to the prosecutor's office, in accordance with the Tort Claims Act, *N.J.S.A.* 59:8–3 to –11. The detective's tort claims notice alleged "improper hiring, screening, training and supervision." The prosecutor's office did not disclose this information to the defendant or defense counsel. Defendant called attention to the State's nondisclosure of the Norcross complaint in a post-sentencing motion for a new trial. The trial court denied that motion on July 22, 1997.

Defendant now appeals her death sentence under *Rule* 2:2–1(a). She has not challenged the convictions, which were based on her guilty pleas.

## II

In every criminal case the prosecution must disclose to the defendant all evidence that is material either to guilt or to punishment. *Brady v. Maryland,* 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1197, 10 *L. Ed.*2d 215, 218 (1963). There are three elements of a *Brady* violation. The evidence must be favorable to the accused; it must be suppressed by the prosecution; and it must be material. *Moore v. Illinois,* 408 *U.S.* 786, 794–95, 92 *S.Ct.* 2562, 2568, 33 *L. Ed.*2d 706, 713 (1972).

Evidence of the Norcross complaint would have been favorable to defendant in the penalty phase. The allegation that law enforcement personnel had been inadequately trained lent direct support to defendant's catch-all mitigating factor. Thus, the first *Brady* element is satisfied.

■ Whether the prosecution should be understood to have suppressed evidence of the Norcross complaint, satisfying the second *Brady* element, depends on whether the prosecution actually or constructively possessed that evidence during the penalty phase. The *Brady* disclosure rule applies only to information of which the prosecution is actually or constructively aware. *See, e.g., Calley v. Callaway,* 519 *F.*2d 184, 223 (5th Cir.1975) (*en banc* ), *cert. denied sub nom. Calley v. Hoffmann,* 425 *U.S.* 911, 96 *S.Ct.* 1505, 47 *L. Ed.*2d 760 (1976). We accept that the trial prosecutor himself did not have personal knowledge of the Norcross complaint. The question is whether knowledge of the complaint should be imputed to the prosecution.

In *Kyles v. Whitley,* 514 *U.S.* 419, 115 *S.Ct.* 1555, 131 *L. Ed.*2d 490 (1995), the Supreme Court reversed the denial of *habeas corpus* relief to a Louisiana defendant convicted of capital murder. The prosecution in that case failed to disclose several statements the police had taken that, according to the Court, "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Id.* at 441, 115 *S.Ct.* at 1569, 131 *L. Ed.*2d at 510. The trial prosecutor was not aware of those statements prior to trial, but the lack of actual awareness did not relieve the State of its *Brady* obligations. Justice Souter reasoned for the Court that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf, including the police." *Id.* at 437, 115 *S.Ct.* at 1567, 131 *L. Ed.*2d at 508. He defined the contours of that duty:

[N]o one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." ... Since, then, the prosecutor has the means to discharge the government's *Brady* responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

[*Id.* at 438, 115 *S.Ct.* at 1568, 131 *L. Ed.*2d at 508–09 (quoting *Giglio v. United States,* 405 *U.S.* 150, 154, 92 *S.Ct.* 763, 766, 31 *L. Ed.*2d 104, 109 (1972)).]

In *Giglio,* the Supreme Court reversed a conviction for the passing of forged money orders because the Government did not disclose that its key witness testified in exchange for a promise that he would not be prosecuted. The promise was made by one of the trial prosecutor's colleagues in the United States Attorney's Office. As in *Kyles* and the present case, the trial prosecutor was unaware of the promise. The Court held the prosecution was constructively aware of the promise to the witness. Chief Justice Burger wrote, "the prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Giglio, supra,* 405 *U.S.* at 154, 92 *S.Ct.* at 766, 31 *L. Ed.*2d at 109 (quoting *Restatement (Second) of Agency* § 272); *see also State v. Carter,* 91 *N.J.* 86, 111, 449 *A.*2d 1280 (1982) ("The prosecutor is charged with knowledge of evidence in his file, 'even if he has actually overlooked it.'") (quoting *United States v. Agurs,* 427 *U.S.* 97, 103, 96 *S.Ct.* 2392, 2397, 49 *L. Ed.*2d 342, 349 (1976)).

The Tenth Circuit has stated that "the 'prosecution' for *Brady* purposes encompasses not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office ..., as well as law enforcement personnel and other arms of the state involved in investigative aspects of a particular criminal venture." *Smith v. Secretary of N.M. Dep't of Corrections,* 50 *F.*3d 801, 824 (citation and footnote omitted), *cert. denied sub nom. Mondragon v. Smith,* 516 *U.S.* 905, 116 *S.Ct.* 272, 133 *L. Ed.*2d 193 (1995).

In this case, the complaint was filed by one of the "law enforcement personnel" involved in the investigation of defendant's "particular criminal venture," and it was brought against the "prosecutor's entire office." *Smith, supra,* 50 *F.*3d at 824. In fact, after receiving Richard Norcross' tort claim notice in July 1995, the Camden County Prosecutor notified County Counsel, in a letter dated August 7, 1995, that the Prosecutor would discuss the complaint with the assistant prosecutor handling defendant's trial. It appears that discussion never took place. Under either *Kyles*

or *Giglio*, we must impute awareness of the Norcross complaint to the trial prosecutor and hold that the evidence was suppressed for *Brady* purposes.

The materiality element of the *Brady* rule is also satisfied. Undisclosed evidence is material for *Brady* purposes if there is a "reasonable probability" that a different result would have been obtained had the evidence been disclosed. *United States v. Bagley*, 473 *U.S.* 667, 682, 105 *S.Ct.* 3375, 3383, 87 *L. Ed.*2d 481, 494 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Ibid.* For these purposes, the "outcome" of the trial may refer to either the determination of guilt or the imposition of punishment. *Brady, supra,* 373 *U.S.* at 87, 83 *S.Ct.* at 1196–97, 10 *L. Ed.*2d at 218. For an appellant, the materiality standard is not difficult to achieve. "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley, supra,* 514 *U.S.* at 434, 115 *S.Ct.* at 1565, 131 *L. Ed.*2d at 506. Rather, the question is whether in the absence of the undisclosed evidence the defendant received a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 *S.Ct.* at 1566, 131 *L. Ed.*2d at 506.

In order to disregard the suppression of favorable evidence, we would have to be confident that the jury would have chosen the death penalty over a term of imprisonment had the State made defendant aware of Norcross' complaint. It is not for us to assess the merits of Richard Norcross' complaint or to judge thereby the conduct of the police. It suffices to observe that the allegations would have profoundly altered the jury's perspective of the case. Norcross was the State's key witness to defendant's conduct during the standoff. He testified about her vicious assault on him as well as the murder of Investigator McLaughlin. Had the jury been aware that this crucial witness, the brother of one of the dead police officers, agreed with defendant that inadequate police training had sparked defendant's violent reaction, it is at least

reasonably probable that an additional juror or jurors would have found the existence of one or more of defendant's mitigating factors. Not only did the prosecution dispute the existence of the mitigating factor concerning the inadequate training of the police officers, it excoriated the defendant for daring to question the conduct of deceased police officers. (Defense counsel referred to the prosecutor's discussion on this point as the "pinnacle" of his summation.) It is also reasonably probable that the jury would have given greater weight to the mitigating factor(s) thus substantiated and would not have been convinced beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating ones. The *Brady* violation requires a retrial of defendant's sentence.

Because the non-disclosure of the Norcross complaint requires us to order a new sentencing trial, we address only briefly the other issues in the case.

## III

Did the trial court erroneously instruct the jury to disregard, for capital-sentencing purposes, the fact that defendant could be non-capitally sentenced to sixty years' imprisonment for the two murders?

Defendant asserts that the court did not accurately inform the jury that it could legitimately consider the cumulative consequence of two non-death verdicts. The court told the jury that for each non-death verdict that it returned, defendant would be sentenced to a term of imprisonment of thirty years to life and would spend at least thirty years in prison. The court added that if it were imposing sentence on both murder charges, there was a reasonable likelihood that the sentences would run consecutively, creating a minimum prison term of sixty years. However, the court admonished the jury not to consider in its deliberations the likelihood that the sentences would run consecutively.

The consequences of the jury's decision whether to vote in favor of the death penalty were explained as follows:

If the answer is yes, the defendant shall be sentenced to death. If the answer is no or the jury is unable to reach a unanimous conclusion after due deliberation, I shall sentence the defendant to a term of imprisonment of between thirty years and life which the defendant shall serve at least thirty years before being considered for parole. If separate sentences are to be imposed by me, the reasonable likelihood is they will run consecutive to one another so the defendant will have to serve at least sixty years before being considered for parole . . . .

Please note that throughout the explanation of the verdict sheet and otherwise during the course of the charge at the request of the parties I have instructed you and told you that if I do not impose—if you do not impose—if the result of your decision is the defendant does not get the death penalty, you do not impose the death penalty and the decision is one of incarceration, the reasonable likelihood is that I will impose or give consecutive sentences, which mean[s] that the defendant would have to serve sixty years before being considered eligible for parole. Now, remember, that's not an aggravating factor, it's not a mitigating factor, [I] went over all the aggravating factors, I've gone through all the mitigating factors. *Therefore, you shall not consider the likelihood, that likelihood as a basis for your decision to impose the death penalty or a sentence of imprisonment* because simply put it's not an aggravating factor and simply put it's not a mitigating factor, but I do bring it to your attention because you should be aware of all the potential consequences of your decision. That's why I bring it to your attention.

[Emphasis added.]

The defendant relies upon the general proposition codified in *N.J.S.A.* 2C:11–3f, that "[p]rior to the jury's sentencing deliberations, the trial court shall inform the jury of the sentences which may be imposed pursuant to subsection b. of this section on the defendant if the defendant is not sentenced to death."

Defendant's argument is that the consequence of a non-death verdict in this case would have been two sentences of thirty years to life that would probably run consecutively. Therefore, the jury should have been asked to weigh death against the likelihood that a non-death verdict on both murder counts would result in a sentence of life in prison without the possibility of parole for sixty years. (Because defendant was thirty-seven years of age at the time of the crime, this effectively meant that she would die in prison.) Instead the jury was told to weigh death against a prison term of thirty years to life, and was, in effect, told to disregard the likelihood that the sentences would run consecutively.

A penalty-phase jury in a capital case, prior to the start of its deliberations, must be informed of the sentencing consequences of

its decision. *N.J.S.A.* 2C:11–3f. In *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987), the Court stated, "To hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence." *Id.* at 311, 524 *A.*2d 188. In *State v. Bey,* 129 *N.J.* 557, 610 *A.*2d 814 (1992) (*Bey III* ), the Court considered whether to inform a penalty-phase jury of the length of a sentence the defendant is serving for a prior crime, there a prior murder that was an aggravating factor in the capital case. The Court held that the jury should be told (1) the amount of time being served under the prior sentence, (2) whether the prior sentence is final or up on appeal, (3) that the decision of whether a non-capital sentence in the present case will be concurrent or consecutive with respect to the sentence already being served is solely up to the court, and (4) not to consider the prior sentence in its decision to impose life or death. *Id.* at 603, 610 *A.*2d 814. The *Bey III* Court explained that jurors should not be permitted to consider prior sentences as aggravating or mitigating factors. It reasoned as follows:

> The focus of the Capital Punishment Act is on individualized sentencing, requiring that the jury determine whether death is the appropriate punishment based on the circumstances of the offense and the aggravating and mitigating factors. To permit consideration of pending sentences for prior crimes might lead to the incongruous result that first-offenders would be more likely to be sentenced to death than would repeat-offenders. The proper balance is struck by informing a jury of pending sentences on request, but instructing the jury to base its life or death decision only on the aggravating and mitigating factors presented by the evidence.
>
> [*Ibid.*]

In *State v. Martini,* 131 *N.J.* 176, 619 *A.*2d 1208 (1993) (*Martini I* ), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 699, 136 *L. Ed.*2d 621 (1997), the Court adopted a prospective rule that required analogous instructions on sentences to be imposed for non-capital counts prosecuted in the same case as the capital count being considered by the jury. *Id.* at 313, 619 *A.*2d 1208. The Court held that

in the future when defense counsel or the jury requests instructions on the potential sentences a defendant will receive for convictions arising from the same trial as his capital-murder conviction, such information should be provided by the trial court. The jurors should be informed of the sentencing options available to the judge, and that the determination of sentence had not yet been made. In addition, the trial court should explain that the sentence may or may not run consecutively to that for murder, but that the determination is left to the court. Finally, the court should inform the jury that defendant's possible sentence for the other convictions should not influence its determination regarding the appropriateness of a death sentence on the murder count.

[*Ibid.*]

*State v. Loftin,* 146 *N.J.* 295, 680 *A.*2d 677 (1996), added the further requirement that when courts know that it is likely that non-capital sentences will be consecutive, the jury should have that information. The Court held that "in future cases, if the court, based on the evidence presented[,] believes that there is a realistic likelihood that it will impose a sentence to be served consecutively to any of defendant's prior sentences, in the event the jury does not return a death sentence, the jury should be so informed." *Id.* at 372, 680 *A.*2d 677.

The trial court complied with the mandate of *Loftin* by informing the jury on multiple occasions that the likely non-death sentences for the murder would be life in prison with a sixty-year period of parole ineligibility. Then, in a manner analogous to the limiting instructions of *Martini I* and *Bey III,* the court instructed the jury not to consider that likelihood as a basis "for your decision to impose the death penalty."

In his summation, defense counsel had urged that the most appropriate sentence was life in prison. In the defense view, the court's instruction undercut the defense's summation and told the jurors to ignore the reality that defendant would have died in jail before even being considered for parole. The defense further asserts that the court's instruction wrongly conveyed to the jury that its choice was between death and parole eligibility in thirty years. The jury was not simply instructed to disregard the sixty years of parole ineligibility. Instead, the jury was instructed in effect to treat the case as if the period of parole ineligibility would be thirty years.

We understand the logic of the defendant's argument but disagree with its reality. It is inescapable to us that the jury knew that it was choosing between death and a life in prison without the possibility of parole. The verdict sheet clearly referred to sixty years as the non-death sentence that the court was likely to impose.

■ At the same time, we should clarify the meaning of our rulings. When a jury is choosing between life and death, it should not be misled into treating the case as one that it is not. The jury should not be told that in choosing between life and death it may not consider the fact that a forty-year-old defendant is likely to spend the next sixty years in prison if its verdict is life. Such an instruction would conflict with our *Ramseur* holding and impermissibly "hide from the jury the full range of its sentencing options." *Ramseur, supra,* 106 *N.J.* at 311, 524 *A.*2d 188.

In future cases, courts should explain to jurors what we mean when we say that the length of the possible sentences other than death should not influence the jury's determination concerning the appropriateness of a death sentence on a murder count. Something along these lines (as refined by the Trial Judges' Committee on Capital Causes) would suffice:

> What I intend to convey when I tell you that your determination of the appropriateness of a death sentence should not be influenced by the sentences that I may impose on other convictions, or in the event you determine that death is not an appropriate punishment for this defendant, is simply that a capital defendant is not more worthy of life because he or she may face a longer confinement in prison than another. A defendant's worthiness for life should depend only on the circumstances of the offense and the aggravating and mitigating factors that have been presented. I have informed you of the potential non-capital sentences only so that you may be fully informed of the effect of your decision.

## IV

Did the prosecution violate defendant's constitutional rights by alluding to defendant's views of the Second Amendment and a "bloody revolution"?

■ Defendant contends that the prosecutor violated her due process and free speech rights by using her views of the Second Amendment and "bloody revolution" to suggest to the jury that

defendant had pursued a personal goal of killing police officers. Because the evidence, as presented, was not probative of any disputed issue in the sentencing phase, we agree.

In the penalty phase, defendant called Doctor Kenneth Weiss as an expert in forensic psychiatry. Doctor Weiss had examined defendant on several occasions and had evaluated her mental condition. During the State's cross-examination, the following exchange took place:

Q. Doctor, on October 10th, 1995, Leslie Nelson told you, and I quote, I'm just a person who loves guns and thinks the Second Amendment is sacrosanct, correct?

A. Yes.

Q. She also told you in that same interview, and this is another quote, the Founding Fathers had in mind that there might be another bloody revolution.

A. Yes. She said that to me.

Q. And she talked to you a number of times about the Constitution and her love of guns, correct?

A. Oh, she certainly talked about her love of guns on a number of occasions. I was more interested, of course, in her attachment to them than I am about her thoughts on the Constitution.

Q. Well, Doctor, if the Founding Fathers as Ms. Nelson interpreted it, her right, and if there were going to be another bloody revolution and if Leslie Nelson were to be a revolutionary, against whom would she be focusing her violence?

A. I really don't know, Mr. Lynch [the prosecutor]. My imagination didn't go that far.

Q. Well, if you're in revolt, sir, you're in revolt against the government, against the authorities, correct?

A. I suppose that would be so.

Q. Well, you don't just suppose that, you know that, sir, if you're talking about revolution, you're talking about revolution against a government, correct, isn't that what revolution means?

A. I believe that's right.

Q. Okay. So the persons in government that represent the interests of government among other people are police officers; isn't that right?

A. That could be interpreted certainly as an authority figure representing the structure of society.

The State pursued this theme in its closing argument. Downplaying the evidence relating to defendant's failures in life, the prosecutor said, "Well, here, here on the twentieth of April, 1995, she found something she could be successful at. She found success because she clearly wanted to kill police officers and she

did it. She was successful and she did it. She was successful and killed them."

No one may be punished in this country for merely espousing particular political beliefs or for associating with others who share those beliefs. *U.S. Const.* amends. I and XIV. Evidence relating to a criminal defendant's beliefs or associations is admissible at trial if it is relevant to material issues or witness credibility; *United States v. Abel,* 469 *U.S.* 45, 52–53, 105 *S.Ct.* 465, 469, 83 *L. Ed.*2d 450, 457–58 (1984); but if evidence of those beliefs does not make the truth of a material proposition any more or less probable, the admission of that evidence is unconstitutional. *Dawson v. Delaware,* 503 *U.S.* 159, 168, 112 *S.Ct.* 1093, 1099, 117 *L. Ed.*2d 309, 319 (1992).

The facts of this case are similar to those presented in *Dawson.* There, the submission of evidence of a defendant's membership in the Aryan Brotherhood was held to violate free speech and fair trial rights. *Ibid.* A jury convicted David Dawson of first-degree murder, which made him eligible for Delaware's death penalty. During the penalty phase, the State sought to introduce evidence relating to Dawson's membership in the Aryan Brotherhood. The parties stipulated that "[t]he Aryan Brotherhood refers to a white racist prison gang that began in the 1960s in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." *Id.* at 162, 112 *S.Ct.* at 1096, 117 *L. Ed.*2d at 315.

The Supreme Court acknowledged ways in which evidence relating to the prison gang might have been relevant and thus permissible, but it concluded that the stipulated facts concerning the gang were too narrow to have any relevance to Dawson's sentencing. The Court noted that evidence of racial intolerance and subversive advocacy may be considered when relevant to disputed issues. *Id.* at 164, 112 *S.Ct.* at 1097, 117 *L. Ed.*2d at 316 (citing *Barclay v. Florida,* 463 *U.S.* 939, 103 *S.Ct.* 3418, 77 *L. Ed.*2d 1134 (1983)). It recalled that Aryan Brotherhood member-

ship was held admissible to impeach a witness when it was shown that members of the gang take oaths to lie for other members. *Id.* at 164, 112 *S.Ct.* at 1097, 117 *L. Ed.*2d at 317 (citing *Abel, supra,* 469 *U.S.* 45, 105 *S.Ct.* 465, 83 *L. Ed.*2d 450 (1984)). However, the Court examined Dawson's stipulation and realized that Delaware had proven only that the Aryan Brotherhood originated in California in the 1960s, that that gang espoused white racist beliefs, and that there is a gang in Delaware's prisons that refers to itself by the same name. *Id.* at 165, 112 *S.Ct.* at 1097, 117 *L. Ed.*2d at 317.

According to the Court, the evidence surrounding the gang was irrelevant to Dawson's sentencing for three reasons. First, the stipulation did not state that Delaware's version of the gang is a racist organization. And even if it were, the Court reasoned that the murder of which Dawson was convicted, unlike the murder in *Barclay,* was not racially motivated because Dawson and his victim were of the same race. *Id.* at 166, 112 *S.Ct.* at 1098, 117 *L. Ed.*2d at 317–18.

Second, Delaware did not establish "that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts." Had Dawson been a member of a gang that endorsed the killing of an "identifiable group," the Court reasoned, that membership "might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future." *Id.* at 166, 112 *S.Ct.* at 1098, 117 *L. Ed.*2d at 318. "But the inference [that] the jury was invited to draw in [Dawson's] case tended to prove nothing more than the abstract beliefs of the Delaware chapter." *Ibid.* The Court held that the First Amendment prohibits the use of evidence that proves nothing more than a defendant's possession of such abstract beliefs. *Id.* at 167, 112 *S.Ct.* at 1099, 117 *L. Ed.*2d at 319.

Third, the *Dawson* Court acknowledged that prosecutors must have the leeway to rebut a capital defendant's mitigating evidence. *Id.* at 167, 112 *S.Ct.* at 1098–99, 117 *L. Ed.*2d at 318. The opinion further suggested that once a capital defendant offers positive

character evidence in mitigation, a State may offer whatever "bad" character evidence it has, even if it does not specifically contradict the defendant's mitigating evidence. *Id.* at 168–69, 112 *S.Ct.* at 1099, 117 *L. Ed.*2d at 319. But Delaware's evidence concerning the prison gang did not even serve that "principle of broad rebuttal" because "the Aryan Brotherhood evidence presented . . . [could not] be viewed as relevant 'bad' character evidence in its own right." *Id.* at 169, 112 *S.Ct.* at 1099, 117 *L. Ed.*2d at 319.

The State's evidence relating to defendant's thoughts on the Second Amendment are in the same category as Delaware's evidence concerning Dawson's membership in the Aryan Brotherhood. The testimony the State elicited from Doctor Weiss established nothing more than defendant's beliefs that the Second Amendment is "sacrosanct" and that the Founders "had in mind that there might be another bloody revolution." Without explaining why the witness, qualified as an expert in psychiatry, would have any knowledge of who the victims of such a bloody revolution might be, the State had Doctor Weiss speculate, in response to leading questions, that "*if* Leslie Nelson were to be a revolutionary," she would "focus her violence" against the government, and possibly against the police as "authority figure[s] representing the structure of society." (Emphasis added.) Had the State proved that defendant desired or advocated violent attacks on the government (such as in the Oklahoma City or World Trade Center bombings), that evidence would have been relevant to rebut defendant's mitigating contentions that the lack of police training, her emotional disturbance, and her impaired capacity to appreciate the wrongfulness of her conduct caused the deaths of the two officers. However, the State never established that defendant was actually a revolutionary. It established nothing more than defendant's "abstract belief" in the importance of the Second Amendment and the Founders' concern about a future revolution. According to *Dawson*, the admission of such "abstract beliefs," without more, violated defendant's First Amendment rights. *Id.* at 167, 112 *S.Ct.* at 1099, 117 *L. Ed.*2d at 318.

Defense counsel did not object to the State's questioning of Doctor Weiss concerning defendant's political beliefs. Because the *Brady* violation requires a retrial, we need not decide whether the improper pursuit of the "Bloody Revolution" theory constituted plain error under *Rule* 2:10–2 requiring a new penalty trial. At a retrial, the State shall be obliged to prove the defendant desired or advocated violent attacks on government as a condition to the admission of such evidence.

V

Other issues raised.

The defendant argues that a portion of the court's instruction may have conveyed to the jury that a finding of aggravating factors but no mitigating factors required that the death penalty be automatically imposed. The judge instructed that "[a] consequence of the jury finding the presence of one or more aggravating factors and the jury not finding the existence of a mitigating factor would mean that all members of the jury agree the appropriate punishment is death."

We agree that the instruction improperly creates the danger that a jury, having found one or more aggravating but no mitigating factors, would impose the death penalty without carefully analyzing and unanimously agreeing upon the appropriateness of death. However, the instruction's placement in the context of the court's entire instruction lessened that danger in this case. Immediately thereafter, the court explained to the jury that "a death verdict cannot be the product again of a mechanical application of a statute. Rather, such a verdict can result only if it is [a] reflection of your judgment that death is the fitting and appropriate punishment in the case you are considering." We are satisfied that this instruction, which we must presume the jury to have followed, *State v. Manley,* 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969), precluded an automatic imposition of the death penalty.

■■■■ Defendant also complains that the trial court consolidated into a single factor on the verdict sheet the police-training circumstance and other catch-all mitigating factors. We have discussed the general issue extensively in *State v. [Ambrose] Harris,* 156 *N.J.* 185–91, 716 *A.*2d 122 (1998) and in *State v. Biegenwald,* 126 *N.J.* 1, 45–49, 594 *A.*2d 172 (1991) (*Biegenwald IV*). No detailed discussion is required here. The bedrock principle of law is that the jury must not be precluded from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense that the defense proffers as a basis for a sentence less than death. In addition, although trial courts need not list every mitigating circumstance separately on verdict sheets and need not demand distinct votes on every factor, *Harris, supra,* 156 *N.J.* at 187–88, 716 *A.*2d 122, "wholly unrelated factors" should be presented separately. *Biegenwald IV, supra,* 126 *N.J.* at 48, 594 *A.*2d 172. There were two wholly unrelated catch-all factors in this case. The first was defendant's mental health. The jury rejected the "emotional disturbance" and "impaired capacity" mitigating factors, but the jury may have reasoned that defendant's psychological problems qualified as a catch-all mitigating factor. It may have found her mental health to be "relevant to [her] prospects of rehabilitation or to the circumstances of the offense[s]." *N.J.S.A.* 2C:11–3c(5)(h). The second factor was the alleged inadequacy of the police training. In a retrial, these unrelated circumstances should be listed separately.

■■■ The trial court did not err in refusing to instruct the jury that the police had probable cause to obtain an arrest warrant at the time of the attempted execution of the search warrant. In support of her contention that the police had acted improperly during the April 20 confrontation, defendant called an expert who testified that the officers' awareness of the illegal weapons in defendant's bedroom would have justified the issuance of an arrest warrant. Defendant's theory was that if the officers had simply arrested her and not threatened to use the search warrant to

invade her personal space, the shootings would not have occurred. At the end of the jury charge, defense counsel objected to the lack of an instruction confirming that the officers did have probable cause to support an arrest warrant. The court stated that it might have done so had the request been more timely, but it declined to call the jury back to give them the requested instruction. We would not reverse based on this exercise of discretion. At a retrial, the request may be renewed.

International law does not require invalidation of New Jersey's death penalty. The United States of America has not subscribed to any international human rights accord that has invalidated the death penalty. *See* Peter J. Spiro, *The States and International Human Rights,* 66 *Fordham L.Rev.* 567 (1997) (observing that the United States has not acceded to "near universally-adopted international human rights conventions"); *see also State v. Makwanyane,* 1995(3) SA 391(CC) (the South African Constitutional Court discussing public international law relevant to the constitutionality of the death penalty).

For completeness of the record, we note and preserve defendant's challenge to the proportionality of her death sentence. With respect to defendant's challenge to the constitutionality of the death penalty statute, we adhere to our decision in *Ramseur, supra,* 106 *N.J.* at 190, 524 *A.*2d 188, in which we rejected arguments that the statute violated the Eighth Amendment of the United States Constitution and Article 1, paragraph 12 of the New Jersey Constitution.

## VI

To sum up, "[a] shocking crime puts law to its severest test. The law triumphs over natural impulses aroused by such a crime only if guilt be ascertained by due regard for those indispensable safeguards which our civilization has evolved for the ascertainment of guilt." *Fisher v. United States,* 328 *U.S.* 463, 477, 66 *S.Ct.* 1318, 1325, 90 *L. Ed.* 1382, 1391 (1945) (Frankfurter, J., dissenting). The State disregarded the safeguard that requires the prosecution

to disclose to an accused all evidence favorable to the defense. That error undermines the jury's verdict.

Our dissenting members acknowledge that this constitutional safeguard was violated, but they find that the violation was not material to determining defendant's punishment. Try as we might, we cannot regard the *Brady* violation as immaterial to determining defendant's punishment. One of the central issues in the penalty trial, if not *the* central issue, was whether defendant's violent reaction could have been avoided had the police officers handled their investigation differently. The suppressed evidence directly supported defendant's mitigating theory. Had the source of that evidence not been the State's star witness in the case, and had the prosecutor's summation not attacked the defendant for daring to question the conduct of the police, we might be able to agree on the question of the materiality of the suppressed evidence.

As the case proceeded, however, the opening remarks of the prosecutor in his closing summation derided Leslie Nelson's expert witness on police procedures for having engaged in "Monday morning quarterbacking" of the officers' conduct. The prosecutor said of the defense expert who criticized the police conduct:

> [W]hen you think about his testimony, when you think about what purports to be a mitigating factor in this case, about the police, think about this expression, if you will. You may have heard it before, maybe in another context but just let it run through your mind. Beware of people, beware of people who sit in the cool of the evening and reflect in the cool of the evening on what better men do in the heat of the day. That man *had the nerve to criticize Jack McLaughlin, had the nerve to criticize those officers?* That's not right, ladies and gentlemen. It's not fair and it's not right. I urge you respectfully to reject that portion of his testimony. Those officers served honorably. They did their jobs. They served and they protected. I urge you to reject that mitigating factor *out of hand.*

> [Emphasis added.]

Had the jury known that in the "cool of the evening" Officer Richard Norcross had also come to "criticize those officers," the jury's perception of that mitigating factor might have been much different.

In this posture of the case, we cannot turn our backs on constitutional obligation. "Of course society must protect itself. But surely it is not self-protection for society to take life without the most careful observance of its own safeguards against the misuse of capital punishment." *Fisher, supra,* 328 *U.S.* at 477, 66 *S.Ct.* at 1325, 90 *L. Ed.* at 1391 (Frankfurter, J., dissenting).

The sentence of death is vacated. We remand the matter to the Law Division for a sentencing retrial on the John Norcross murder in accordance with this opinion.

HANDLER, J., concurring and dissenting.

On April 20, 1995, defendant, Leslie Nelson, shot and killed two police officers and severely wounded another as the police attempted to serve and execute a search warrant for guns she kept in her apartment. The two officers who died were Investigator John McLaughlin and Officer John Norcross. Detective Richard Norcross, John's brother, was severely injured. The Camden County Grand Jury indicted defendant for two counts of knowing-or-purposeful murder by her own conduct, eight counts of first-degree attempted murder, third-degree unlawful possession of an assault firearm, and second-degree possession of a firearm for an unlawful purpose. The Camden County Prosecutor's Office served notice of the following four aggravating factors for each capital murder offense: (1) the murders created a grave risk of death to Detective Norcross, (2) each murder was committed for the purpose of escaping detection, apprehension, trial, punishment, or confinement for the unlawful possession of a firearm, (3) each murder was committed while defendant was engaged in the murder of the other officer, and (4) each murder occurred while the officers were engaged in the performance of their official duties.

Defendant did not contest her guilt for the murders. She pled guilty to two counts of murder for the murders of Investigator McLaughlin and Officer Norcross, and she pled guilty to the lesser included count of second degree aggravated assault of Detective Norcross. The only issue that was tried was whether she should be executed for her crimes.

A jury was empaneled to consider whether to impose the death penalty, and defendant asked the jury to consider three mitigating factors: (1) she was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution, (2) her capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law was significantly impaired as the result of a mental disease or defect, but not to a degree sufficient to constitute defense to prosecution, (3) and the catch-all factor. The primary focus of the catch-all factor was that the police were inadequately trained to serve a search warrant for weapons in the possession of a person with her degree of emotional and psychological disturbances and that, as a result, their action was needlessly and dangerously threatening and confrontational, thereby provoking rather than averting a violent reaction.

After hearing eight days of evidence and arguments from counsel, the jury voted to sentence defendant to death for the murder of Officer Norcross, but they could not unanimously agree on the sentence for the murder of Investigator McLaughlin.

The Court rules in Part II, III, and IV of its opinion respectively, that the non-disclosure of mitigating evidence requires reversal, *ante* at 501, 715 *A*.2d 288, the failure to permit the jury to consider the practical consequences of its decision was error but harmless, *ante* at 504, 715 *A*.2d 290, and the prosecutor's cross-examination of a defense psychiatric expert about defendant's political beliefs was error, but the Court does not address whether it was reversible error, *ante* at 510, 715 *A*.2d 293.

I join Part II of the Court's opinion, and I agree with the findings of error in Parts III and IV. Nevertheless, the Court concludes that these errors, each significant, substantial and highly prejudicial, do not warrant a reversal of defendant's death sentence. I disagree, and therefore dissent from Parts III and IV of the Court's opinion.

I

By killing two police officers in the line of duty, defendant committed one of the worst crimes known to our law. The jury did not have to determine whether defendant was guilty of these crimes or whether these crimes rendered defendant eligible for the death penalty. Defendant conceded both. The jury was to decide only defendant's sentence, and it had the task of weighing the aggravating circumstances of the crime against any mitigating circumstances. Defendant's mental, psychological and emotional condition were central to her claims for mitigation. Defendant was a failed transsexual who suffered from depression, anxiety, and paranoid disorders. Her guns, in particular a 9 millimeter Browning handgun, had become her primary source of comfort. In the period leading up to April 20, 1995, she would retreat to her room four to six times a day and calm herself by going through a ritual in which she would sit and caress the handgun.

Her medical and psychological history paint a pathetic picture. Without sufficient psychological basis, in 1992, defendant underwent sexual reassignment surgery—removing her male genitalia and constructing female genitalia in its place—in an attempt to redress her social problems with being an outcast and a loner. Unlike most people who undergo the surgery as a remedial response to transexuality, defendant did not have the clinically accepted conditions of transsexualism. She did not harbor the persistent, unshakeable sense that she was truly a female even though physically she was a male—that she was a woman "trapped" in a man's body. Defendant did not want to become a woman in order to reconcile her physical gender with her psychological gender. Rather, she merely wanted to look like a woman so she could attract the attention of men. She believed she could attain that level or form of adjustment by "becoming" a woman. Her plan had been to work as an exotic dancer. However, she was uncoordinated and unpopular with the bar patrons and owners, and her attempt to solve her problems by becoming a sex object was unsuccessful. Nevertheless, she continued to think

that plastic surgery was the answer; she told one psychologist that her problems could be solved if she had bigger breasts. Defendant's failure as a woman deepened her depression and her sense of isolation. She became withdrawn. The rituals in which she would sit on her bed listening to music and caressing her handgun were her only refuge for solace.

Defendant's psychological condition explained her violent response to the police attempts to serve the search warrant. Her acute anxiety and paranoid thinking caused her to feel threatened when the police tried to come into her bedroom to take away her gun. That picture of defendant, her bizarre psychological derangement and profound emotional disturbance, if believed, would serve as a powerful counter-balance to the devastating inference that defendant shot the officers as part of a cold, calculated, premeditated process. The prosecutor undermined the defense's mitigation evidence based on defendant's mental health by introducing evidence that defendant was prompted by revolutionary motives rather than by the irrational and delusional need to keep her world intact.

The linchpin of defendant's mitigation case, however, was her claim that the police were inadequately trained to handle situations involving mentally-ill and emotionally-disturbed people who are armed and dangerous. The defense asked the jury to consider that the situation could have been avoided if the police had known how to minimize the risks involved in controlling the situation. The prosecutor derogated and attacked the defense for even suggesting that the police had acted negligently. He characterized the officers as brave and defendant as a zealous and predatory killer. He said:

> Beware of people who sit in the cool of the evening and reflect in the cool of the evening on what better men do in the heat of the day. That man had the nerve to criticize Jack McLaughlin, had to nerve to criticize those officers? That's not right, ladies and gentlemen. It's not fair and it's not right. I urge you respectfully to reject that portion of his testimony. Those officers served honorably. They did their jobs. They served and protected. I urge you to reject that mitigating factor out of hand.

Unbeknownst to the defense, at the time the prosecutor was making those very arguments to the jury and stressing that the police were beyond criticism, the State's chief witness, Detective Norcross had filed a lawsuit blaming his injuries at the hands of defendant on the police department's failure to provide adequate supervision and training.

## II

I concur with the Court's holding that the failure to disclose Detective Norcross's lawsuit was a substantial violation of the due process requirements of *Brady v. Maryland,* 373 *U.S.* 83, 87, 83 *S.Ct.* 1194, 1196, 10 *L. Ed.*2d 215, 218 (1963). *Ante* at 501, 715 *A.*2d 288.

We accept as true the prosecutor's assertion that he had no personal knowledge of Detective Norcross's lawsuit. That cannot serve as an excuse for withholding vital evidence from a defendant. The prosecutor's office cannot avoid the consequences of its knowledge of material evidence by disclaiming its obligation to inform its lawyers of all relevant matters in the case. *Giglio v. United States,* 405 *U.S.* 150, 154, 92 *S.Ct.* 763, 766, 31 *L. Ed.*2d 104, 109 (1972). Prosecutor's offices are required to establish "procedures and regulations . . . to insure communications of all relevant information on each case to every lawyer who deals with it." *Ibid.* The reason for requiring all information be communicated to the trial prosecutor is to enable the prosecutor to satisfy the overriding obligation to assure the defendant a fair trial. Under *Brady,* all material that is relevant to a prosecution must be communicated and shared with the trial prosecutor in order to enable the prosecutor to exercise a sound informed judgment on behalf of the State to ensure that the defendant receives a fair trial. *Kyles v. Whitley,* 514 *U.S.* 419, 437–38, 115 *S.Ct.* 1555, 1567–68, 131 *L. Ed.*2d 490, 508 (1995).

In this case, the Court has recognized that there are at least two means through which the trial prosecutor should have been informed of Detective Norcross's lawsuit. *Ante* at 500, 715 *A.*2d

287. First, Detective Norcross was a law enforcement officer working directly with the prosecution, and, as such, he should have informed the prosecutor that he had filed a lawsuit based on the same allegations as those made by defendant regarding police negligence that were crucial to the defense. *See State v. Carter,* 69 *N.J.* 420, 429, 354 *A.*2d 627 (1976) (imputing knowledge of police investigator to prosecutor); *State v. Lozada,* 257 *N.J.Super.* 260, 274, 608 *A.*2d 407 (App.Div.1992) (imputing knowledge of police to prosecutor); *United States v. Thornton,* 1 *F.*3d 149, 158 (3d Cir.1993) (imputing knowledge from "all enforcement agencies that had a potential connection with the witness" to prosecutor); *United States v. Perdomo,* 929 *F.*2d 967, 971 (3d Cir.1991) (imputing information known to "some arm of the state" to prosecutor); *United States v. Hankins,* 872 *F.Supp.* 170, 172 (D.N.J.1995) (imputing knowledge that is known to "some arm of the state"); *United States v. Galvis–Valderamma,* 841 *F.Supp.* 600, 608 (D.N.J.1994) (imputing knowledge from "prosecution team"). Second, the acting Camden County Prosecutor had knowledge of Detective Norcross's tort claim notice and was aware of its relevance to this case. He also should have communicated that information to the trial prosecutor.

Additionally, it cannot be doubted that the evidence that Detective Norcross had brought a law suit satisfies the "materiality" requirement of a *Brady* claim. The materiality standard is specifically designed to encourage prosecutors to disclose information to the defense in close cases. *Kyles, supra,* 514 *U.S.* at 439–40, 115 *S.Ct.* at 1568, 131 *L. Ed.*2d at 509. The prosecutor was required to disclose Detective Norcross's law suit so long as there was "reasonable probability" that the result would have been different. *United States v. Bagley,* 473 *U.S.* 667, 682, 105 *S.Ct.* 3375, 3383, 87 *L. Ed.*2d 481, 494 (1985). Evidence that Detective Norcross believed that the police had acted negligently, and presumably was prepared to prove as much, would have powerfully supported the defense's mitigating factor that alleged that the police were ill-prepared and inadequately trained. There was at least a reasonable probability that it would have influenced the jury's evaluation

of the mitigating factor's existence and weight. In addition to the fact that Detective Norcross had filed a complaint charging the police department with negligence, that information would have provided defendant with additional avenues of investigation to develop evidence to demonstrate that the police were inadequately trained and acted negligently in confronting defendant, thereby contributing to the homicidal violence that occurred when they attempted to confiscate her guns.

The defense's claim that the police mishandled the situation was central to the case in mitigation of the two murders. By returning a death verdict for the murder of Officer Norcross but not for the murder of Investigator McLaughlin, the jury found that the evidence about defendant's emotional and mental distress mitigated only the events that occurred inside the house. The claim that the police mishandled the situation was vital because it had the potential to mitigate both murders if the jury believed that the police, if properly trained, could have averted the outbreak of violence.

The defense, however, was faced with the difficult task of trying to present this mitigating evidence without creating the appearance of insulting the police, who where the tragic victims of defendant's violence. The defense presented three expert witnesses, who criticized the manner in which the police handled the situation, on this point. The prosecutor characterized this as an unfair attack. He attacked the defense for daring to suggest that the police mishandled the situation. The prosecutor impugned these experts for their criticism of what "better men do in the heat of the day," and he admonished the jury to reject "out of hand" the mitigating factor that was predicated on that criticism.

If the defense had been able to present evidence that Detective Norcross had not only alleged that the police mishandled the situation, but filed a lawsuit to back up that claim and, in addition, had defendant been able through discovery to develop evidence to support that position, defendant would have been able to provide powerful support for the opinions of her experts. The jury would

have been hard put to reject defendant's claim "out of hand" for the reason urged by the prosecutor. Unlike the experts presented by the defense, Detective Norcross was one of the officers at the scene and the State's chief eyewitness during the trial; he was not a paid expert hired to render an opinion after the fact. Given the Detective's own expertise and credibility, his assessment of the manner in which the police handled the situation would have been given great weight by the jury. Detective Norcorss's views could hardly be lumped together with the "cool reflection" by "outsiders" that the prosecutor ascribed to the defense.

We cannot be confident that the jury did not accept the prosecutor's argument and reject the mitigating factor out of hand because the witnesses hired by the defense were the only sources of evidence to support it. To the contrary, it is likely that the jury would have given more weight to the position that the police acted negligently if they understood that Detective Norcross himself agreed with it. That, indisputably, could have induced the jury to accord greater weight to the mitigating factor and the ultimate balance struck between mitigating and aggravating factors. Therefore, the availability at trial of Detective Norcross's complaint would have created at least a reasonable probability sufficient to undermine confidence in the outcome. *Bagley, supra,* 473 *U.S.* at 682, 105 *S.Ct.* at 3383, 87 *L. Ed.*2d at 494.

The dissent, explaining that the defense could have asked Detective Norcross about his evaluation of the events, even though they were not aware of the complaint, finds that knowledge of Detective Norcross's lawsuit was not likely to alter the outcome of the case. *Post* at 535–36, 715 *A.*2d 305–06. The dissent assumes that the defense should have been confident that his answers would have been motivated by a desire to enhance a civil claim. *Post* at 537, 715 *A.*2d 306. That reasoning ignores the perils of cross-examining a hostile witness. Without knowing that Detective Norcross had filed a civil complaint, it would have been reckless of defense counsel to assume that Detective Norcross would agree with defendant's primary mitigating factor. The

defense should not be required, particularly in a life-and-death contest, to engage in such a high-stakes gamble. If the defense had known about the civil complaint, as it had every right to know, it could have used the complaint not only as a basis for developing additional evidence, it could also have asked the Detective about the lawsuit, and used the complaint to impeach him if he tried to deny that the police were negligent.

The dissent, saying that this "single" mitigating factor could not have outweighed the "sum" of the aggravating factors, also downplays the importance of the mitigating factor. *Post* at 537–38, 715 A.2d 306–07. However, this "single" factor that the dissent dismisses so readily constituted the bulk of defendant's mitigating case. The determinative process of assessing the severity of a capital defendant's sentence is not a numbers game. The number of aggravating factors versus mitigating factors plays no role in the weighing process. A single mitigating factor may outweigh any number of aggravating factors. If the jurors had found that the police could have prevented the violent confrontation with defendant, they might have found that factor alone to be a sufficient reason to spare her life. It is not the responsibility of this Court to say that the factor could not have mitigated the crime.

Finally, the dissent asserts that the evidence from Detective Norcross would have been cumulative and that the other evidence was more helpful than Norcross's complaint would have been. *Post* at 538, 715 A.2d 307. However, the prosecutor unfairly attacked the defense's evidence by challenging its source, the status of the experts as defense witnesses. Thus, the source of the evidence about the police negligence was central to the jury's evaluation of that evidence. The complaint would have provided a non-cumulative, and likely more trustworthy, source. Its probative worth cannot be minimized.

Accordingly, I strongly concur in the Court's holding that the withholding of that evidence warrants the reversal of defendant's death sentence.

## III

It was error for the trial court to instruct the jury to disregard the likelihood that defendant would be sentenced to consecutive terms with at least a total of sixty years parole ineligibility. I concur with the Court's holding that the jury instruction was error. *Ante* at 505, 715 *A*.2d 290. I dissent, however, from its determination that this error was harmless.

In order to ensure that the jury is "fully informed about their sentencing options," including the "practical effect of a life sentence," the Court in *State v. Loftin*, 146 *N.J.* 295, 373, 680 *A*.2d 677 (1996), ordered that

in future cases, if the court, based on the evidence presented[,] believes that there is a realistic likelihood that it will impose a sentence to be served consecutively to any of defendant's prior sentences, in the event the jury does not return a death sentence, the jury should be so informed.

[*Id.* at 372, 680 *A*.2d 677.]

Today, we clarify that not only must the jury be told of the sentencing options and their practical consequences, but the jury must also be permitted to consider those practical consequences when weighing its options. *Ante* at 505, 715 *A*.2d 290. I agree that "[t]he jury should not be told that in choosing between life and death, it may not consider the fact that a forty-year-old defendant is likely to spend the next sixty years in prison if the verdict is life." *Ibid.* Informing the jury of the sentencing consequences of its decision would be of little value if the jury were not permitted to take those consequences into account when making its decision.

I strongly endorse the principle that the jury must be permitted to consider the practical sentencing consequences of its decision. Nonetheless, I am concerned that the proposed jury instruction that attempts to limit the use of the other sentences would serve only to confuse and perhaps mislead the jury. The instruction creates an artificial distinction between considering the other sentences as aggravating or mitigating factors, on the one hand, and considering undefined effect of the other sentences on the options that are the subject of the jury's deliberations, on the

other hand. There should be no difference in principle between telling the jury to take into account the punitive effect of other sentences as compared to a death sentence in considering the practical consequences of its sentencing decision, as the Court now requires; and permitting the jury to consider the other sentences as "mitigating" evidence, as the Court now disallows. The majority of the Court has always been concerned that it would be unseemly to refer to other sentences as "mitigating" because the fact that a person has committed multiple crimes does not make the person less blameworthy. *See State v. Feaster*, 156 *N.J.* 85, ——, 716 *A.*2d 395 (1998); *State v. Cooper*, 151 *N.J.* 326, 405, 700 *A.*2d 306 (1997); *State v. Martini*, 131 *N.J.* 176, 311, 619 *A.*2d 1208 (1993) (*Martini I* ); *State v. Bey*, 129 *N.J.* 557, 603, 610 *A.*2d 814 (1992) (*Bey III* ); *State v. Biegenwald*, 126 *N.J.* 1, 49, 594 *A.*2d 172 (1991) (*Biegenwald IV* ). I understand the Court's compunctions. It would be a perverse morality to think that someone could be less "blameworthy" because he or she has committed multiple offenses. In the context of a capital prosecution, however, the issue is not one of morality. Rather, the issue is whether evidence may be classified and considered as "mitigating" for the purpose of determining the severity of the defendant's sentence. Mitigating evidence under the law may be any relevant circumstance that supports a reasonable and acceptable alternative to a death sentence, and hence a factor that would militate against imposition of the death sentence. A relevant circumstance may relate to the character and condition of the individual defendant that can persuades a jury not to impose the death sentence. In the lexicon of capital murder jurisprudence, the word "mitigation" is a term of art. It is not a philosophical concept or an expression of morality or moral values. The Court becomes enmeshed in semantics when it interprets "mitigating" evidence essentially as that which renders a defendant less "blameworthy." Mitigation evidence is not limited simply to evidence that would make the defendant seem less morally culpable or blameworthy (although it usually does that), but rather mitigation is anything that bears on the defendant's circumstances, his character and condition, that would tend

to make the jury less inclined to impose the sentence of death for his crime. Mitigating,and aggravating, factors are those that help the jury gauge the severity of the defendant's sentence. As the Court recognized in *State v. Davis,* 96 *N.J.* 611, 477 *A.*2d 308 (1984):

> It must be acknowledged that in the sentencing phase of a capital proceeding—a life or death contest—a defendant is entitled to the use of all reliable, helpful information. The determinative discretion that is invoked in criminal sentencing is extremely sensitive. A sentencing judge may exercise a far-ranging discretion as to the sources and types of evidence used to assist him or in determining the kind and extent of punishment to be imposed.
>
> [*Id.* at 619–20, 477 *A.*2d 308.]

How then can the fact that a defendant, if spared from the death penalty, will never see the light of day outside of prison because he is guilty of multiple murders not be considered a factor that supports a reasonable and acceptable alternative to the death sentence?

As the Court has unequivocally recognized, it is error to tell the jury not to take into account the practical consequence of the defendant's other sentences. This admonition is given to guide the jury in its sentencing determination. It follows that it would be confusing to give the jurors this admonition and, in the same instruction, tell them that the other-sentences factor is *not* aggravating or mitigating. Jurors in capital cases are told to measure the severity of the sentence by weighing the aggravating and mitigating factors. In *State v. Bey,* 112 *N.J.* 123, 548 *A.*2d 887 (1988) (*Bey II* ), the Court said: "The court should have expressly instructed the jury that a consequence of finding one or more of the aggravating factors and no mitigating factors meant that the jury thought that the death penalty was a fitting and appropriate punishment." *Id.* at 164, 548 *A.*2d 887. Thus our sentencing standard requires that the jury be instructed that a consequence of their finding that there are mitigating factors and those mitigating factors are outweighed by aggravating factors means that the jury thought that the death penalty was a fit and appropriate punishment. That sentencing standard would be incomplete if the jury could not include in that weighing process as a mitigating

factor the likelihood, if not virtual certainty, that the defendant would spend the rest of his or her life in prison if not sentenced to death. If the jury is told that the consequences of the defendant's other sentences are not mitigating, many jurors will be left wondering what role, if any, the other sentences are to play in their decision. If the jury is told to arrive at its decision by weighing the aggravating and mitigating factors and also instructed that the defendant's other sentences are not mitigating, there is a substantial risk that the jury will think that it is not supposed to consider the effect of the defendant's other sentences in determining the severity of defendant's sentence and whether it should be death.

Therefore, I think that the sounder rule is to instruct the jury to consider the defendant's other sentences as a mitigating factor.

I also very much disagree with the Court's harmless error analysis of the instruction on the consequences of defendant's other sentences. The court told the jury, "[Y]ou *shall not* consider the likelihood [that the sentences will be consecutive], that likelihood as a basis for your decision to impose the death penalty or sentence of life imprisonment." (Emphasis added.) As already discussed, the Court recognized that it was error to tell the jury to disregard the likelihood of consecutive sentences. Nonetheless, the Court finds that the instruction was harmless error because the defense attorney argued that the jurors should consider that defendant would spend her life in prison and the jurors knew that the sentences would likely be consecutive. *Ante* at 504, 715 *A.2d* 290.

In other words, the Court finds the judge's erroneous instruction harmless because its presumed prejudice was ostensibly rebutted and negated by defense counsel's argument. That reasoning inverts the doctrine harmless error in death penalty cases. The Court has repeatedly held that improper arguments of counsel are rendered harmless by the court's correct instructions because the jury is presumed to follow the court's instruction rather than counsel's argument. *See, e.g., Bey III, supra,* 129

*N.J.* at 622, 610 *A.*2d 814 (holding that prosecutorial misconduct in summation was rendered harmless in part by the court's corrective instruction). The converse surely cannot be true. It cannot follow that correct arguments of counsel can be substituted for incorrect instructions of the court. If that were so, instructions and arguments would always be rendered harmless so long as either the court or counsel got it right. In fact, when there is a conflict, the court's instructions must prevail. As the Court recognized recently in *State v. Afanador,* 151 *N.J.* 41, 56, 697 *A.*2d 529 (1997): "[A]rguments of counsel cannot substitute for correct instructions of law. The trial judge is the most authoritative figure in the courtroom." Thus, an attorney's summation, no matter how correct on a salient point that bears vitally on the jury's understanding of the law can never acquire the force of law if it is not expressly iterated by the court through proper and accurate jury instructions. Moreover, the error cannot be minimized or trivialized. It cannot be argued that the court's instructions that failed to inform and direct the jury to consider the consequences of defendant's other sentences in determining the severity of her sentence was a minor or incidental omission. That omission goes to the very heart of the most fundamental issue this jury had to determine—should the defendant be put to death. The Court's omission clearly constituted an "incorrect instruction." *Cf. State v. Sewell,* 127 *N.J.* 133, 150, 603 *A.*2d 21 (1992) (striking down charge that did not fully explain essential elements of crime); *State v. Anderson,* 127 *N.J.* 191, 205, 603 *A.*2d 928 (1992) (same).

Therefore, I would also reverse defendant's death sentence because the court's erroneous instruction telling the jury not to consider the practical consequences of defendant's other sentences on its decision was not harmless.

## IV

The defense presented the expert testimony of a psychiatrist, Dr. Kenneth Weiss, who reviewed defendant's medical records and

met with her at least five times for the purpose of evaluating her. On direct examination, Dr. Weiss testified about defendant's psychological development culminating with the day of the murders. One of the things Dr. Weiss testified about was defendant's obsessive psychological attachment to her guns.  This testimony was offered in mitigation in an attempt to provide a psychological explanation for defendant's homicidal reaction to the police attempt to take away her guns.  Capital defendants have a right to present mitigating evidence relevant to "any aspect of their character or record or circumstances of their crime." *State v. DiFrisco*, 137 *N.J.* 434, 506, 645 *A.*2d 734 (1994) (citing *Lockett v. Ohio*, 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964, 57 *L. Ed.*2d 973, 989 (1978)). Defendant raised three mitigating factors, including her extreme mental or emotional disturbance and her significant impairment from mental disease or defect.  It was thus essential that defendant be given a full opportunity to ask the jury to consider this expert testimony as a reason to spare her life.

On cross-examination, the prosecutor elicited testimony that during Dr. Weiss's psychological examinations of defendant, she told him that she believed that the Second Amendment to the United States Constitution was sacrosanct and that the founding fathers had thought the right to bear arms was important because they expected another revolution.  Then, in a series of argumentative and leading questions, the prosecutor took Dr. Weiss far afield from his area of expertise and personal knowledge. Through tendentious, leading questions, the prosecutor extracted the expert's opinion that defendant herself was a revolutionary who wanted to kill police officers.

It was highly improper and grossly unfair for the prosecutor to attempt to taint defendant's mitigation by suggesting that her views on the Second Amendment demonstrated that she was a revolutionary.  There was absolutely no logical connection between defendant's statements about the Second Amendment and the prosecutor's argumentative questions that strongly implied that she was a radical.  The inflammatory suggestion that defen-

dant had a calculated desire and plan to kill police officers because they represented the government was highly prejudicial. One of the aggravating factors presented to the jury was the contention that defendant killed the officers because of their status as police officers. If the jurors believed that defendant was a revolutionary bent on killing police officers, it is highly likely that they would have found the murders extremely aggravated.

Perhaps more important than the effect of this evidence to augment that State's key aggravating factor is the potential effect that the testimony had on defendant's mitigating evidence, namely, that her violence was triggered by her mental and emotional impairment. If the jury believed she was carrying out a revolutionary plan directed against the police as government authority, it would likely discount defendant's contention that she was acting under extreme emotional disturbance or that her judgment was seriously impaired by mental disease or defect. The prejudicial impact of this evidence of a revolutionary motive as undermining and negating defendant's mitigation evidence was heightened by the.fact that the prosecutor used one of defendant's psychology experts as the vehicle for introducing the evidence of her revolutionary motives. As noted, after Dr. Weiss testified that he believed defendant was suffering from mental and emotional problems, the jury heard him say on cross examination in response to a series of leading questions that he believed defendant was a revolutionary. Clearly, there was no medical basis for this testimony, yet it was brazenly elicited and flagrantly emphasized. The jury almost certainly could not help but be affected by hearing from defendant's own expert that she was a revolutionary. Most recently, in *State v. Jamerson*, 153 *N.J.* 318, 342, 708 *A.2d* 1183 (1998), the Court recognized that juries cannot properly evaluate the weight to give "expert" testimony from an expert who testified outside the realm of his or her expertise. "By definition, a jury cannot give the 'proper' amount of weight to an expert's opinion when they labor under the erroneous assumption that the expert is testifying to an area within his expertise. Furthermore, '[t]he aura of special reliability and trustworthiness surrounding expert

testimony, which ought to caution its use, especially when offered by the prosecution in criminal cases, poses a special risk' when it involves the question of defendant's guilt." *Ibid.* (citations omitted). Dr. Weiss had no knowledge or expertise regarding the revolutionary tendencies of people who believed that the Second Amendment gives them the right to own weapons. Yet, as an expert, he was asked by the prosecutor to express his opinion on that subject and his testimony likely had a telling impact on the jury.

The Court agrees that the evidence was improper but declines to reach the issue of whether it constituted plain error. I believe its admission was plain error, which is error that is "clearly capable of producing an unjust result." *R.* 2:10-2. Whether an error was sufficiently prejudicial depends on whether it "had the capacity materially to affect the jury's deliberations or produce an unjust result." *Bey III, supra,* 129 *N.J.* at 616, 610 *A.*2d 814.

Whether erroneously admitted evidence is likely to affect the jury's determination depends greatly on the amount of other evidence available to the jury on the same point. *See State v. Marrero,* 148 *N.J.* 469, 496, 691 *A.*2d 293 (1997) (finding no plain error where the evidence of guilt independent of the erroneously admitted evidence was "nearly overwhelming"); *State v. J.Q.,* 252 *N.J.Super.* 11, 15, 599 *A.*2d 172 (App.Div.1991) (finding that erroneously admitted expert testimony on Child Sexual Abuse Accommodation Syndrome was plain error because the jury's determination of the witnesses' credibility was "based in great measure" upon the evidence), *aff'd* 130 *N.J.* 554, 617 *A.*2d 1196 (1993). Defendant, in this case, could not escape the prejudicial fallout from this testimony. Indeed that prejudice was reinforced and driven home by the prosecutor who argued that, "here on the twentieth of April, 1995, she found something she could be successful at. She found success because *she clearly wanted to kill police officers* and she did it. She was successful and she did it. She was successful and killed them." (emphasis added). The evidence elicited from Dr. Weiss was virtually the only evidence

available to support that argument. It enabled the prosecutor to argue to the jury that defendant was a revolutionary committed to killing police officers and that her motive was to kill the police officers because they were police officers. That evidence and the prosecutor's powerful argument based on it were in no way palliated. An instruction from the court telling the jury to disregard erroneously admitted evidence may counteract the potential prejudicial effect of improper evidence and support a finding of no plain error. *See State v. Harvey*, 151 *N.J.* 117, 226, 699 *A.*2d 596 (1997) (finding that prosecutor's improper argument did not constitute plain error because court instructed jury on the proper use of evidence); *Cooper, supra,* 151 *N.J.* at 403, 700 *A.*2d 306 (same). That was not done here.

There was a substantial risk that the jury inferred from the improper evidence that defendant had a calculated desire to kill police officers. That inference would have increased the likelihood that they would return a death verdict. Therefore, I would find that the elicitation of such testimony from Dr. Weiss was reversible error.

## V

Defendant's penalty trial contained three grave reversible errors. First, defendant's death sentence must be reversed, as determined by the Court, because of the failure to inform the defense that Detective Norcross had filed a civil lawsuit alleging negligence in the same manner that defendant alleged as one of her primary mitigating factors. I also agree that it was erroneous to inform the jury not to consider the likelihood of consecutive sentencing, but I dissent from the finding that it was harmless error. Finally, it was grossly improper for the prosecutor to elicit unfounded testimony from a defense expert that defendant was a revolutionary and killed out of revolutionary zeal. Therefore, I would reverse on all three grounds.

It is clear that this defendant, guilty of committing terrible murders, was not given a fair penalty trial. It is precisely

defendants of this ilk, those whose guilt is clear, whose crimes are horrible, and whose characters are grossly unsympathetic, who put our judicial system to its severest test. The challenge to accord such a defendant due process and fundamental fairness, though present in any case, is most daunting and formidable in a capital prosecution. The State did not meet that challenge here.

COLEMAN, J., concurring in part and dissenting in part.

I concur in the Court's opinion in all respects except its holding that defendant's death sentence must be vacated because of a *Brady* violation.

The three elements of a *Brady* violation are: (1) the evidence must be favorable to the accused, (2) it must be suppressed by the prosecution, and (3) it must be material. *Moore v. Illinois*, 408 U.S. 786, 794–95, 92 *S.Ct.* at 2562, 2568, 33 *L. Ed.*2d 706, 713 (1972). I agree with the majority that the first two elements are satisfied. My disagreement with the majority concerns the materiality element. I disagree with the majority's conclusion that evidence of the Norcross civil complaint "would have profoundly altered the jury's perspective of the case." *Ante* at 500, 715 *A.*2d 287–88. I also disagree with the majority's conclusion that it is "reasonably probable that the jury would have given greater weight to the mitigating factor(s) thus substantiated and would not have been convinced beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating ones." *Ante* at 501, 715 *A.*2d 288. I dissent because I am not persuaded that evidence of the Norcross civil complaint would have, based on a reasonable probability, affected the jury's decision to impose the death penalty for the murder of Officer Norcross. The jury's verdict is worthy of the confidence of this Court.

I

During the penalty phase, defendant sought to prove the following mitigating factors: (1) that defendant was under the influence of extreme mental and emotional disturbance insufficient to consti-

tute a defense to prosecution, *N.J.S.A.* 2C:11–3a(5)(a); (2) that defendant's capacity to appreciate the wrongfulness of her conduct and conform to the requirements of the law was significantly impaired, *N.J.S.A.* 2C:11–3a(5)(d); and (3) the catch-all factor, *N.J.S.A.* 2C:11–3a(5)(h). As part of the catch-all factor, defendant's major contention was that the law enforcement officers who sought to execute the search of defendant's bedroom had inadequate training, preparation, and support from the Camden County Prosecutor's Office and the Haddon Heights Police Department for dealing with a mentally disturbed person, especially one known to have a firearm.

In support of defendant's mitigating argument that both the Camden County Prosecutor's Office and the Haddon Heights Police Department had inadequately trained their officers, defendant offered the testimony of Theodore Novak, Esq., of the New Jersey Division of Mental Health and Guardianship Advocacy. Novak testified that the police should have taken defendant to a mental health screening center immediately after she made the threat to kill herself, rather than attempting to arrest her. In addition, defendant presented the testimony of Dr. Paul McCauley, professor of criminology at Indiana University of Pennsylvania. Dr. McCauley testified, agreeing with Novak, that there were errors that occurred before the police left the Nelson home. Dr. McCauley testified that, based on the facts known to the officers before returning to the Nelson residence, the search warrant was clearly a "high risk warrant" and neither the Camden County Prosecutor's Office nor the Haddon Heights Police Department had any formal grading system for the risk involved in the execution of warrants; nor did they have any formalized protocol for dealing with the execution of a dangerous warrant. According to Dr. McCauley, if such a plan were in place, the actions of the police would have been very different. He suggested an assortment of various techniques that the police could have used. It was Dr. McCauley's opinion that the police badly mishandled the execution of the warrant, and that the lack of formal-

ized procedures for warrant service substantially contributed to the deaths of Investigator McLaughlin and Officer Norcross.

For the State, Detective Norcross was the second witness to testify on April 29, 1997, the first day of the penalty trial. He was not questioned concerning the appropriateness of the officers' actions when executing the warrant. He testified that it was Investigator McLaughlin's decision regarding the procedure to be used in executing the warrant. On cross-examination, defense counsel did not explore the issue further with Detective Norcross.

As the majority opinion accurately reflects, it was discovered after the trial had ended that Detective Norcross had filed a civil complaint against defendant, her parents, the Camden County Prosecutor's Office, and the Haddon Heights Police Department. The complaint, which was not verified, was filed on April 18, 1997, just two days before it would have been barred by the statute of limitations. The complaint alleged that the Camden County Prosecutor "was negligent in the performance of his duties by failing to provide proper training and instruction to ensure the safety of the Haddon Heights Police Officers; failing to instruct his staff to so warn the officers of the Haddon Heights Police Department; and was otherwise negligent." Detective Norcross's complaint also alleged that defendant's physician negligently provided pre-operative and post-operative treatment for "gender identity confusion." Although the complaint was served on the Camden County Prosecutor five days before the jury returned with its verdict, defendant was not served until after the jury returned its verdict.

With respect to the murder of Officer Norcross, a single interrogatory was listed on the verdict sheet regarding the lack of proper training and supervision of the officers executing the search warrant. It stated:

> any other factor which any juror finds relevant to Leslie Nelson's prospects of rehabilitation or to the circumstances of the offenses, including, but not limited to the defendant's contention that the law enforcement officers, who on the 20th of April, 1995 were trying to carry out an investigation and search for illegal firearms in Leslie Nelson's bedroom, had inadequate training, preparation, and support from the Camden County Prosecutor's Office and from the Haddon Heights Police

Department for dealing with a disturbed person, particularly one known to possess a firearm.

The jury was instructed that it could find any mitigating factor from any reliable evidence, that there was no burden of proof, and that unanimity was not required. Although the same three mitigating factors were submitted to the jury regarding each of the two murders, the jury voted differently on the factors for each murder. In the case of Investigator McLaughlin, the jury unanimously found extreme mental or emotional disturbance, two jurors found that defendant did not appreciate the wrongfulness of her conduct, and four jurors found that the catchall factor was established. In contrast, in the case of Officer Norcross, the jury voted unanimously to reject the first two mitigating factors, and three jurors voted for the catchall factor.

## II

The focus now shifts to an analysis of whether suppression of the civil complaint satisfies the *Brady* materiality element. As the majority makes clear, the United States Supreme Court has stated that the materiality standard can be satisfied "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 *U.S.* 667, 682, 105 *S.Ct.* 3375, 3383, 87 *L. Ed.*2d 481, 494 (1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 *U.S.* 97, 109–110, 96 *S.Ct.* 2392, 2400, 49 *L. Ed.*2d 342, 353 (1976). New Jersey has adopted the *Bagley* standard of materiality. *State v. Marshall,* 148 *N.J.* 89, 155–56, 690 *A.*2d 1 (1997); *State v. Knight,* 145 *N.J.* 233, 247, 678 *A.*2d 642 (1996).

"The reviewing court should assess the possibility that [error] might have occurred in light of the totality of the circum-

stances...." *Bagley, supra,* 473 *U.S.* at 683, 105 *S.Ct.* at 3384, 87 *L. Ed.*2d at 494. Defendant claims that with knowledge of the lawsuit, she would have vigorously cross-examined Detective Norcross about his claim of inadequate training, and also prevented the State from attacking defense experts in summation. I find those arguments to be unpersuasive. I am confident that defense counsel's knowledge of the civil complaint would not have changed the verdict.

Contrary to defendant's assertion, the suppressed complaint itself is not substantive evidence. The unverified complaint was signed by counsel for plaintiff and represented mere allegations made by counsel on behalf of Detective Norcross. *See R.* 1:4–5. The complaint was signed and filed April 18, 1997. The fact that the complaint may be deemed to constitute hearsay insofar as Detective Norcross is concerned does not mean that defense counsel could not have used the document to assist with questioning him. Given what defense counsel knew about the case, however, the same questions could have been asked without the complaint. Strategic choices made by defense counsel as to plausible options are virtually unchallengeable. *State v. Davis,* 116 *N.J.* 341, 357, 561 *A.*2d 1082 (1989).

Defense counsel knew that the two murders occurred on April 20, 1995, and that Detective Norcross was shot in the same incident. Defense counsel served notice that improper training and supervision of the law enforcement officers executing the search warrant were included in the catchall mitigating factor. Indeed, they urged the trial court to treat that allegation as a separate mitigating factor. They also knew that the Borough of Haddon Heights and the Camden County Prosecutor were the public entities that they alleged in the notice of mitigating factors to have negligently trained and supervised the persons executing the warrant. They also knew that Detective Norcross was one of those who went into the house to execute the warrant and was severely injured when he, too, was shot. Defense counsel are presumed to have known that because Detective Norcross was

injured, he had ninety days to serve notice on any public entity of intent to file suit, *N.J.S.A.* 59:8–8a, and two years from April 20, 1995, to file a complaint. *N.J.S.A.* 59:8–8b. Given the state of defense counsel's knowledge, it was clear that when Detective Norcross testified on April 29, 1997, if no civil complaint had been filed by then it was time barred.

In addition, counsel should have anticipated that the detective would have been motivated to enhance, not hurt, his civil claim. Any answer that would have been damaging to defendant's alleged mitigating factor would be equally damaging to the detective's civil claim. Statements made under oath that are contrary to the declarant's pecuniary interest would be admissible against that person in a civil action pursuant to *N.J.R.E.* 803(c)(25). The fact that one of the murder victims was the detective's brother would not have increased the risk that his answers might have been against defendant's best interest. When the law enforcement officers left defendant's home to obtain the search warrant, they had already concluded that she was very unstable. She was described as being paranoid. Under the circumstances, the officers created the strong potential for concurrent causes of Detective Norcross's brother's death. The allegations in the complaint were that the police were improperly trained, but there were no allegations that the officers whom defendant killed were negligent.

Defendant cannot demonstrate how the complaint was material, or how knowledge of the complaint would have affected the result of the trial. Although the majority assumes that "the allegations would have profoundly altered the jury's perspective of the case," *ante* at 500, 715 *A.2d* 287–88, the jury would not have reached a different conclusion even if presented with the complaint because it held that each aggravating factor alone outweighed the mitigating factors. The majority claims that evidence of the complaint could have led the jury to find "the existence of one or more of defendant's mitigating factors." *Ante* at 501, 715 *A.2d* 288. However, negligent supervision was a part of only one of defendant's mitigating factors, the catch-all factor. Even if the jury accepted

defendant's factor in mitigation, the sum of the aggravating factors would still have outweighed that single mitigating factor related to Officer Norcross's murder. There is no likelihood that the jury would have reached a different conclusion if defendant had knowledge of the complaint.

The facts in the case compellingly establish why the jury imposed the death sentence for the murder of Officer Norcross and not for the murder of Investigator McLaughlin. Investigator McLaughlin went into the house to execute the warrant and was shot inside the house. All of the jurors agreed that defendant was under the influence of extreme mental or emotional disturbance when she killed McLaughlin. Two jurors found that defendant lacked the capacity to appreciate the wrongfulness of her conduct at that time. Four jurors found that the catchall mitigating factor had been established.

In contrast, Officer Norcross did not arrive at the scene until after the shooting in the house had ended. He responded as part of a backup team. He was shot by a rifle while he was standing across the street in a driveway. The jurors unanimously rejected the first two mitigating factors. Three jurors, as opposed to four, voted that the catchall mitigating factor had been established. The circumstances surrounding the two murders were so different that I am confident that the suppressed complaint does not meet the materiality standard.

In addition, defendant informed the jury through her expert, Dr. McCauley, that not only was there improper training and supervision of the officers executing the warrant, but that subsequent to the murders, the Camden County Prosecutor and the Borough of Haddon Heights had instituted written procedures "relating to the execution of high risk warrants." Although presentation of that evidence to show improvements in operational procedures subsequent to the murders to infer an admission by the public entities that they were previously negligent would have violated *N.J.R.E.* 407 in a non-capital case, the impact of that

evidence was much more helpful to defendant than the suppressed complaint would have been.

Finally, the failure to question Detective Norcross about a potential or pending civil complaint was a matter of strategy. Defendant's trial strategy was to rely on experts to establish improper training and supervision. To do that, defendant had to concede that the preconditions for the admission of expert testimony had been met. Generally, there are three basic requirements for the admission of expert testimony: "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." *State v. Jamerson*, 153 *N.J.* 318, 337, 708 *A.*2d 1183 (1998) (quoting *State v. Kelly*, 97 *N.J.* 178, 208, 478 *A.*2d 364 (1984)). The allegations in the suppressed complaint did not make the detective an expert or affect any potential of qualifying him as an expert.

Not only was the complaint not material under *Brady*, but it was cumulative to other evidence presented at trial. The subject of negligent police training was fully litigated through the presentation of defense experts, including Dr. McCauley. "Evidence that is merely cumulative does not create a reasonable possibility that the verdict would have been affected." *State v. Carter*, 91 *N.J.* 86, 114, 449 *A.*2d 1280 (1982).

"[T]here [is] no reasonable possibility that a different verdict would have arisen had the [complaint] been disclosed." *State v. Marshall*, 123 *N.J.* 1, 207, 586 *A.*2d 85 (1991). "For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose." *Agurs, supra*, 427 *U.S.* at 108, 96 *S.Ct.* at 2399, 49 *L. Ed.*2d at 352.

I would affirm the imposition of the death penalty.

GARIBALDI, J., joins in this dissent.

*For vacating and remandment*—Justices HANDLER, POLLOCK, O'HERN and STEIN—4.

*For affirmance*—Justices GARIBALDI and COLEMAN—2.